Gordon **BOODY,** individually, and as Special Administrator of the Estate of Carol M. Boody, Deceased, Plaintiff,

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 85–1741–T.

United States District Court, D. Kansas.

Feb. 23, 1989.

As Corrected Feb. 27, 1989.

Richard Cordry, Wichita, Kan., for plaintiff.

Stephen K. Lester, Asst. U.S. Atty., Wichita, Kan., for defendant.

## OPINION AND ORDER

THEIS, District Judge.

This matter comes before the court for final disposition after a four day bench trial. Plaintiff brings this medical malpractice action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680. Plaintiff's claim is based on the "loss of chance of survival" theory adopted by the Kansas Supreme Court in *Roberson v. Counselman*, 235 Kan. 1006, 686 P.2d 149 (1984). After reviewing the evidence heard at trial, the parties' post-trial memoranda and the trial transcript, the court is prepared to rule. Pursuant to Rules 52 and 58 of the Federal Rules of Civil Procedure, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The decedent, Carol Boody, was born June 10, 1935. She was married to plaintiff for more than thirty years. She died on December 1, 1987, at the age of 52.

2. The court will outline decedent's relevant medical history and then review in detail the expert testimony. Decedent went to the McConnell Air Force Base Hospital near Wichita, Kansas on January 3, 1983. She complained of cold symptoms, pleurisy, and a sharp pain in her left side. Pl.Ex. no. 101, at 370. The physician requested chest x-rays, both PA and lateral views. Dr. Tuason, a McConnell radiologist, reviewed the x-rays and gave them a "normal" diagnosis. Pl.Ex. no. 102 at 418; Pl. Exs. nos. 128–29.

3. Fourteen months later on March 9, 1984, decedent returned to the Base Hospital with similar complaints: cold, pleurisy and chest/sternum pain. A physical examination noted considerable tenderness in the sternum. Pl.Ex. no. 101 at 371. The examining physician ordered a second set of x-rays. Dr. Tuason reviewed decedent's x-rays and found a 3 centimeter (cm.) lesion in her right lung. Pl.Ex. no. 102 at 419. On March 13, surgery was performed at St. Joseph Medical Center in Wichita. The lesion in her right lung was a cancerous tumor. Pl.Ex. no. 101 at 9, 14–15, 17–18. A CT scan on March 18 was normal and decedent was soon discharged from St. Joseph's.

4. Less than two months later on May 10, a second CT scan revealed a brain tumor. Pl.Ex. no. 102 at 521; Pl.Ex. no. 112. Decedent underwent radiation therapy. Doctors discovered a second brain tumor in September 1984. Reeves Test. at 44; Pl.Ex. no. 115. Thereafter, decedent fought the cancer with radiation therapy, chemotherapy, and surgery. Plaintiff's Post-trial Brief, Dkt. no. 42, at 19–22. She died several years later on December 1, 1987.

5. Plaintiff alleges negligent care by the Air Force's Dr. Tuason in failing to properly read the January 1983 x-ray and catch the cancer in an early stage. Plain-

tiff attempted to establish negligence through the expert testimony of Dr. Bradford Reeves. Reeves is a twenty year board certified radiologist. He practiced radiology in Wichita for seventeen years before moving to Texas where he now practices. While in Wichita, he taught radiology to medical students and estimates he read approximately 70,000 chest x-rays in his practice. Reeves is a member of major radiology societies. Tr. at 10–14. The court found Reeves a competent expert witness.

6. The crux of Reeves' critique of Tuason's examination of the January 1983 x-rays is that Tuason failed to notice a "linear density immediately behind the sternum." Id. at 22–23. The linear density appeared to have "the shape of an area of atelectasis." Id. at 23. An atelectasis is an area of the lung that is partially collapsed. Id. An atelectasis is a warning sign to physicians to look for the cause of the collapsed bronchus. Reeves summarized:

> "(T)his atelectasis implies that something has caused the air to leave a small segment of the lung, and may be an area of pneumonia and some secretions get in there and cause that part of the lung to collapse, or it could be a little tumor that blocks the bronchus and all of a sudden there's no air in that part of the lung, so it's nonspecific in that it can be due to different causes, the atelectasis."

Id. at 24. The atelectasis was approximately 5 millimeters in diameter and 1.5 cm. in length. Id. at 27. The tumor found in March 1984 was in exactly the same spot as the atelectasis on the January 1983 x-ray. Id. at 38–40.

7. Reeves testified that Tuason departed from standard medical practice: "He failed to report this abnormal density we see on the lateral view of the chest at that time." Id. at 32. Defendant United States presented no expert testimony on this question. Defendant's post-trial brief does not address Dr. Tuason's conduct. Dkt. no. 45.

8. Plaintiff's second expert was Dr. Dennis Moore. Moore is board certified in internal medicine, oncology and hematolo-

gy. He is a member of the American Societies of Hematology and clinical Oncology. Moore works with the Wichita Community Clinical Oncology Program, a prominent, national cancer research center. Moore Test. at 98–104.

9. Moore testified that decedent had Stage I cancer in January 1983 and a fifty-one percent chance of surviving five years if diagnosed then. Id. at 115–16, 135–36. Moore based his conclusion on the research reported in several articles and his long experience with cancer patients and research. Id. at 121–22, 125–26, 190–92. Moore's conclusion is better understood with some scientific background.

10. First, an explanation of the system used to measure the growth stages of cancer. Moore testified that the method presently used by most doctors and hospitals for identifying the growth stage of a tumor is the TNM classification system. T is for tumor size. Id. at 108. "N stands for the number of nodes that are involved with cancer." Id. M stands for metastasis—the growth of a secondary tumor somewhere else in the body. Id. Each letter has a number attached to it which represents the presence of the property represented by the letter. Id. at 108–110. For example, a T1 tumor is a small tumor—less than three cm. in length.

11. Decedent's tumor in January 1983 was most likely a T1 N0 M0: a tumor less than three cm. in length and without nodes or metastases. Decedent's lung tumor was always less than three cm., even when removed in 1984—a T1. No nodes were found on the tumor in 1984; an N0 in either year. Finally, Reeves explained that his review of the January 1983 x-ray revealed no metastasis. Thus, the 1983 tumor *not* discovered was a T1 N0 M0. A tumor of this type is given a Stage I classification and is the most treatable. Id. at 49–50, 115–18.

12. Decedent's tumor when discovered in 1984 was Stage III, the most serious stage, a T1 N0 *M1*. By March 1984, a secondary tumor had developed in the brain (metastasis). Id. at 42 (Reeves), 115–18

(Moore). A very slight chance for five year survival exists after brain metastasis.

13. Defendant presented expert testimony that decedent had a Stage III tumor in January 1983. Dr. Vincent Collins based his testimony on his theory of tumor growth. Collins theory rests on two grounds: 1) the growth rate of tumors is constant and 2) primary and secondary tumors grow at the same rate. Collins Test. at 13, 28. Armed with these two assumptions, Collins can calculate a tumor's date of birth if he knows the size of a tumor at two distinct times.

14. Dr. Collins applied his theory to decedent's medical history. He first noted that in January 1983 decedent's lung tumor was one cm. in length and in March 1984, 400 days later, was two cm. *Id.* at 35. Dr. Collins then calculated:

> So, in that case in this period of some 400 days some four doublings occurred, which would give us a doubling time of 100 days. If we apply the doubling of 100 days and that the tumor that was overlooked was a centimeter in diameter, then it had undergone 30 doublings. Thirty doublings of 100 days would be 3,000 days, which is approximately eight years, and this tumor has been present then for eight years before that first chest film.
>
> Q. Do you have an opinion as to whether or not that tumor in her lung had metastasized prior to 1983?
>
> A. It would have to metastasize before that time because the—if the minimal lesion in the brain was on the order of a centimeter in diameter and had undergone some 30 doublings and carrying that back, it would have to have formed back in 1976.

*Id.* at 35–36.

15. Collins concluded Dr. Tuason's failure to properly read the x-ray in January 1983 had no effect on decedent's chance of survival. Collins opined she would have died even with the proper diagnosis; the lung and brain tumors had been with her for too many years. "Well, in view of the fact that we have shown that not only had this (the lung tumor) been present for several years, but even the brain metastasis had already been present at that time, it would not have changed the evidence for this lady." *Id.* at 37.

16. Plaintiff's expert, Dr. Moore, directly contradicted Dr. Collins explanation of tumor growth. Moore acknowledged Collins' theory once held wide support; however, he stated that over the last ten years the base assumptions of Collins' theory are no longer considered valid. Moore Test. at 128–29. Moore explained that researchers now believe a tumor has different rates of growth at different times in its life span. The tumor grows very fast up to about one cm. in size and then its growth rate begins to slow down. *Id.* at 129–31, 132–35. Second, metastases grow faster than primary tumors. *Id.* at 131, 137–42. Moore expressly disagreed with Collins' view that the metastasis was in the brain eight or ten years earlier. *Id.* at 141. Although Moore could not say exactly when the metastasis occurred, his view was that Dr. Tuason's failure to spot the lung tumor in January 1983 significantly diminished the chance to remove the tumor before metastasis could occur. *Id.* at 141–43.

17. The court accepts Dr. Moore's explanation of tumor growth. Dr. Collins *had* considerable expertise and repute. Collins Test. at 6–10. While his work in the 1950's and 1960's may have placed him at the leading edge of his field, he has not maintained that position of stature. Dr. Collins has not done research or published a paper on tumor growth rates since 1969. *Id.* at 38, 64. Collins was totally unaware of the 1985 research on tumor growth on which Moore based his testimony. *Id.* at 64. Collins currently is semi-retired. He retired from a Houston hospital in 1983 but came back to manage a department six months before testifying. He sees some patients; he also reviews case histories for litigation. *Id.* at 6–8, 39–40. Moore meanwhile is in active practice with the "primary" federally funded clinical oncology research center in this *country*. Moore Test. at 100–103, 103. Moore presented the authoritative and up to date explanation of tumor growth. The court finds Dr.

Moore's testimony more persuasive than Dr. Collins: decedent had a five year survival rate of fifty-one percent because of the unliklihood her lung tumor had metastasized.

18. Plaintiff presented undisputed testimony of unreimbursed medical expenses of $24,377.00, Pl. Exs. nos. 104–107, and funeral expenses of $5,352.25, Pl. Exs. nos. 110–111.

19. Both decedent and plaintiff testified concerning her past and future wages. Decedent received her LPN certificate in the late 1970's. She worked as a substance abuse counselor for two years in 1980–82. Carol Boody Depo at 19–20. She earned less as a counselor than at her final job as the Director of Nursing at Lincoln East Nursing Home in Wichita, Kansas in 1979. *Id.* at 12–14, 20. Decedent worked at the nursing home for the nine months prior to July 1983. *Id.* at 13, 30. She earned just over $15,000 per year in that position: $300 per week multiplied by 52 weeks per year. *Id.* Decedent quit working "(b)ecause my husband was making too much money and everything I was making was going to taxes." *Id.* at 30; *accord id.* at 13. Plaintiff testified that decedent quit work to spend more time with the couple's two teenage children and because the bulk of her income went to taxes. He further testified that decedent would have returned to work in 1985 after the last child completed high school as a nurse or substance abuse counselor.

20. The court finds decedent's explanation of why she stopped working most persuasive. Her testimony was more contemporaneous to the decision to quit than plaintiff's trial testimony. Second, plaintiff corroborated decedent's "tax" explanation in his trial testimony. The court finds plaintiff's claim that decedent would have returned to work in 1985 or 1986 of dubious nature. The testimony is undercut by decedent's testimony that she quit because of plaintiff's high earnings and the result that her salary went to pay taxes. Plaintiff made no claim that this economic reality would have changed any in 1985 or 1986. Also, decedent failed to mention in her deposition any desire to return to work had she not been stricken with cancer. Finally, the court notes the self-serving nature of the testimony.

21. The court received significant, credible testimony from both decedent and plaintiff about her pain and suffering. Decedent went through months of chemotherapy and radiopathy. She had several operations to remove tumors. Her struggle with cancer was long and agonizing.

22. The Boodys had a strong marriage. They enjoyed vacationing together and provided strong mutual support for each other. Decedent provided substantial care for their two children. She took time between jobs in the 1979–84 period to spend more time with the children. In particular, she wanted to work with one child to deal with school problems. The court finds decedent provided and would have continued to provide substantial assistance and affection to her family.

## CONCLUSIONS OF LAW

1. The court has subject matter jurisdiction over this action pursuant to the Federal Tort Claims Act [FTCA], 28 U.S.C. § 1346(b). Personal jurisdiction is proper. Venue is proper in this district. The defendant is the United States and the cause of action arose in this district and the plaintiff resides in this district. 28 U.S.C. § 1391(e)(2), (4). Plaintiff exhausted the administrative hurdles required by 28 U.S. C. § 2675. The matter is properly before the court.

2. In an FTCA case, the United States "shall be liable ... in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The United States is liable for the negligent actions of its agents. The substantive law of the state where the cause of action arose governs an FTCA case. *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). Kansas law controls this matter.

3. Negligence in a medical malpractice action requires the plaintiff to prove three elements by a preponderance of the evidence: 1) a physician was negligent in

his/her treatment of plaintiff; 2) the physician's negligence caused harm to plaintiff; and 3) plaintiff suffered damages. *Cleveland v. Wong*, 237 Kan. 410, 416, 701 P.2d 1301 (1985).

4. The first element, negligence, is shown by demonstrating the violation of a duty. A physician has a duty to "'use reasonable and ordinary care and diligence in the treatment of cases he undertakes, to use his best judgement, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other physicians.'" *Durflinger v. Artiles*, 234 Kan. 484, 489, 673 P.2d 86 (1983) (quoting *Malone v. University of Kan. Medical Center*, 220 Kan. 371, 375, 552 P.2d 885, 888 (1976)). In a medical malpractice case, "expert medical testimony is ordinarily required to establish negligence or lack of reasonable care on the part of a physician or surgeon in his *medical diagnosis*, performance of surgical procedures and care and treatment of patients." *Webb v. Lungstrum*, 223 Kan. 487, 490, 575 P.2d 22 (1978) (emphasis added).

5. Causation is the second element of a medical malpractice claim. The standard for establishing causation in situations

> involving negligent treatment of a potentially fatal condition ... is generally a matter to be determined by the finder of fact where the evidence has established the patient had an appreciable chance to survive if given proper treatment. In making the determination, the finder of fact should take into account both the patient's chances of survival if properly treated and the extent to which the patient's chances of survival have been reduced by the claimed negligence.

*Roberson v. Counselman*, 235 Kan. 1006, 1020, 686 P.2d 149 (1984).

6. A review of the facts in *Roberson* illustrates the practical working of this reduced standard of causation. Plaintiff sued a chiropractor in *Roberson* for his failure to recognize that plaintiff was suffering a heart attack in his office and refer plaintiff to a cardiologist. 235 Kan. at 1007–08, 686 P.2d 149. Expert testimony

in *Roberson* stated that plaintiff lost a forty percent chance of survival because of defendant's actions. 235 Kan. at 1009, 1021, 686 P.2d 149. The trial court entered summary judgment for the chiropractor because plaintiff lacked "a better than even chance of surviving the heart attack." 235 Kan. at 1013, 686 P.2d 149. Under the trial court's reasoning, defendant could not "cause" plaintiff's injury because plaintiff would have died anyway. The Kansas Supreme Court reversed and declared that plaintiff presented a submissible jury question on causation. This court cannot find any subsequent decision by a Kansas appellate court on this issue to illustrate the application of the causation standard. *Roberson* is part of a growing number of courts to adopt this type of causation test and recognize a cause of action for a less than even chance of survival. *Keir v. United States*, 853 F.2d 398, 415–17, 417 (6th Cir.1988) (collecting cases and quoting *Roberson* with approval).

7. After outlining the applicable legal standards, the court will apply them to the instant facts. The court turns first to the breach of duty of care question. Plaintiff's expert, Dr. Reeves, provided credible testimony that Dr. Tuason failed to use reasonable care in his review of the lateral chest x-ray in January 1983. Defendant provided no expert testimony to rebut this point and does not discuss it in its brief. The court is compelled by Reeves' testimony and the lack of counter evidence to reach the conclusion that Tuason breached his duty of care to decedent by failing to note the one cm. atelectasis in the right lung.

8. The second issue in the negligence formula is causation. The court finds that decedent was deprived of "an appreciable chance to survive" by Tuason's breach of a duty of care. *Roberson*, 235 Kan. 1020, 686 P.2d 149. The first *Roberson* factor is "the patient's chance to survive if given proper treatment." *Id.* Based on Dr. Moore's testimony, the court concludes that with a proper diagnosis in January 1983 decedent would have had a Stage I tumor with a fifty-one percent chance of surviving

five years. The court expressly rejects the theory advanced by defendant's expert that an early diagnosis would have made little difference because decedent's tumor had already metastasized. While the court cannot rule out metastasis prior to January 1983, the testimony of Drs. Reeves and Moore persuades the court that decedent had a Stage I, non-metastasized tumor in January 1983. Proper treatment would have given decedent a significant chance of surviving five years.

9. The other *Roberson* factor is the degree the claimed negligence reduced decedent's chance of survival. 235 Kan. at 1020, 686 P.2d 149. A January 1983 diagnosis by Dr. Tuason would have provided decedent with a much greater chance of having the tumor removed prior to metastasizing. With Dr. Tuason's breach of care, decedent was not diagnosed until she had Stage III cancer and her five year survival rate was very slight. Thus, defendant's negligence deprived her of almost all of her chance to survive five years. The court rules that the *Roberson* causation test is satisfied.

■ 10. Defendant's arguments against causation are completely unpersuasive. First, defendant contends Dr. Moore's testimony that the tumor had not metastasized in January 1983 and that she had a fifty-one percent chance of surviving five years is too speculative to support a verdict. Defendant is no doubt correct that Dr. Moore cannot say with ultimate certainty the state of decedent's tumor at a given moment or the number of days decedent would live. This is a problem, however, that faces all courts when trying to reconstruct events after the fact. The Kansas Supreme Court in *Roberson* relied on expert testimony in a situation remarkably like the one before the court. Plaintiff's experts in *Roberson* had to determine what chance for survival the plaintiff lost by not receiving a *prompt diagnosis*. 235 Kan. at 1007–09, 686 P.2d 149. Defendant's argument overlooks the great reliance courts have placed on expert opinions, medical or otherwise, over the last forty years. The court cannot accept defendant's definition of speculative; its sweep is far too wide.

■ 11. The second contention by defendant is that a fifty-one percent chance of surviving five years is not an "appreciable chance to survive" within *Roberson*, 235 Kan. at 1020, 686 P.2d 149. Dkt. no. 45 at 4–7. The premise of defendant's point is that plaintiffs in *Roberson* type situations fall under the traditional causation rule and must show that "but for" the negligence they would have lived or they had at least a better than fifty percent chance of surviving without the negligent care. The *Roberson* court explicitly rejected this rule. After reviewing numerous cases from other jurisdictions, 235 Kan. at 1013–20, 686 P.2d 149, the court reversed summary judgment and remanded for trial based on expert testimony that plaintiff had only a *forty* percent chance of survival with proper treatment. 235 Kan. at 1021, 686 P.2d 149. Defendant's position is exactly like that of an Ohio court the Kansas Supreme Court expressly declined to follow. The court stated:

> The reasoning of the district court herein (which is similar to the extreme position taken in *Cooper v. Sisters*, 27 Ohio St.2d 242 [272 N.E.2d 97 (1971)]), in essence, declares open season on critically ill or injured persons as care providers would be free of liability for even the grossest malpractice if the patient had only a fifty-fifty chance of surviving the disease or injury even with proper treatment. Under such rationale a segment of society often least able to exercise independent judgment would be at the mercy of those professionals on whom it must rely for life-saving health care.

235 Kan. at 1021, 686 P.2d 149.

12. Defendant's third claim is simply a reappearance of its first argument in bizarre clothing. The U.S. argues from *McClesky v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), that the statistical evidence provided by Dr. Moore is too speculative to support a verdict. Dkt. no. 45 at 7–11. In *McClesky*, the Court found a statistical study of Georgia death penalty cases inadequate to support a capital defen-

dant's Equal Protection claim that his death sentence was imposed discriminatorily. 107 S.Ct. at 1766–69. The *McClesky* Court did not throw out the use of statistics; it held they did not support a finding of purposeful discrimination in the criminal sentencing process. The differences between *McClesky* and this case are legion. The court need not dwell on an analogy so far a field.

13. The final issue in a medical malpractice case is damages. Plaintiff apparently premises its request for $1,364,729.25 in damages on two grounds: 1) decedent lost a fifty-one percent chance to live out a normal life, i.e. a prompt diagnosis would have cured her and 2) plaintiff should be compensated for the entire value of decedent's life. Dkt. no. 42 at 17–22. Regarding plaintiff's first assumption, plaintiff's experts did not testify that decedent had a fifty-one percent chance of being *cured.* Instead, they testified that she had a slightly better than even chance of surviving five years. Plaintiff cannot stretch the expert testimony to encompass a cure and a normal life span. The second assumption is untested in state law. The *Roberson* court did not discuss how to calculate damages when a plaintiff loses a chance for survival. Neither party at trial or in their post-trial briefs commented on any analytical differences between the damages awarded in a typical negligence case and a lost chance of survival case.

14. Although lacking state court guidance on this question, the court is confident it can discern the sound approach the Kansas Supreme Court would likely follow. *Daiton, Inc. v. Pennwalt Corp.,* 741 F.2d 1569, 1574 (10th Cir.1984). Three methods of apportioning damages are possible. *DeBurkarte v. Louvar,* 393 N.W.2d 131, 137 (Iowa 1986); J. King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences,* 90 Yale L.J. 1353, 1381–82 (1981). First, the court or jury, without explicit guidance, could arrive at a compensation figure. While simple in formulation and fully allowing a decision maker to render justice, this rule is flawed. The decision maker needs some circum-

scription to properly evaluate the compensation necessary for the loss of a fractional right. The damages inquiry, when possible, should be more precise. As explained below, the loss of chance theory lends itself to precision. The first option is rejected.

15. A second method would provide full compensation for the loss of life regardless of the decedent's less than even chance of survival. *Thompson v. Sun City Community Hosp.,* 141 Ariz. 597, 688 P.2d 605, 615–16 (1984); *Kallenberg v. Beth Israel Hosp.,* 45 App.Div.2d 177, 357 N.Y.S.2d 508, 510–11 (1974); *aff'd,* 37 N.Y.2d 719, 374 N.Y.S.2d 615, 337 N.E.2d 128 (1975). This approach is too onerous for defendants. They should not have to compensate a plaintiff for the percentage of the harm they did not cause or that would have occurred naturally. *See* K.S.A. 60–258a (comparative negligence statute). The second method should not apply here.

16. The most logical approach is to compensate plaintiffs for what they lost: the approximate percentage chance of living or surviving for a fixed period of time. For example, if a person would have had a thirty percent chance to survive a heart attack with proper treatment but died because of negligent treatment, the plaintiff recovers thirty percent of the value placed on the decedent's life. Thus if the jury believed decedent's life was worth two million dollars, plaintiff would recover $600,000. King, *Causation, Valuation and Chance,* 90 Yale L.J. at 1382.

17. Many courts have followed Professor King's analysis and adopted the percentage apportionment of damages method. *Mays v. United States,* 608 F.Supp. 1476, 1482–83 (D.Col.1985); *McKellips v. Saint Francis Hosp., Inc.,* 741 P.2d 467, 476 and nn. 25–26 (Okl.1987); *DeBurkarte,* 393 N.W.2d at 137; *Herskovits v. Group Health Cooperative of Puget Sound,* 99 Wash.2d 609, 664 P.2d 474, 487 (Pearson, J., concurring).

18. The court determines the percentage allocation is the most reasonable method and the one the Kansas Supreme Court would adopt. This method is prefer-

able because it apportions damages in direct relation to the harm caused; it neither over compensates plaintiffs or unfairly burdens defendants with unattributable fault. Second, the percentage method gives juries and judges concrete guidelines on how to measure damages, alleviating the "pulling out of the hat" problem identified with the first method. If the decision maker believes plaintiff's expert(s) on causation, the percentage of chance lost, then it makes the usual finding on the value of a life ($X) and multiplies $X by the percentage of chance lost to arrive at the compensation for the lost chance to survive.

19. An application of the damage formula to the instant facts is straightforward. The court first calculates the total value of the decedent's life. Plaintiff's damages are defined by two state statutes, the wrongful death statute, K.S.A. 60–1901 to –1905, and the survival statute, K.S.A. 60–1801 to –1802. The wrongful death statute is designed to compensate the decedent's heirs for loss of companionship and support after the death; the survival statute compensates the decedent's estate for injuries suffered by the decedent between the date of injury and death. *Mason v. Gerin Corp.*, 231 Kan. 718, 721, 647 P.2d 1340 (1982).

20. Plaintiff requests one million dollars under the survival statute for decedent's pain and suffering from 1984 until her death in December 1987. Dkt. no. 42 at 22. The court has seriously considered the request. A jury applying common sense and experience and considering the commonly recognized agony of cancer treatment would probably have had no trouble with the evidence before the court showing such a prolonged period of suffering before death. Therefore, in the absence of any contrary evidence and the fraction to be applied, the court somewhat reluctantly finds the one million dollar valuation to be within reason and the evidence.

21. Under the wrongful death statute, plaintiff can recover for three amounts: nonpecuniary loss; unreimbursed medical and funeral expenses; and pecuniary loss. K.S.A. 60–1903(c) (1987). Plaintiff re-

quests the statutory maximum of $100,000 for nonpecuniary loss. K.S.A. 60–1903(a). The court concludes plaintiff's testimony supports a recovery of the statutory maximum of nonpecuniary damages. The court received ample testimony of a strong marriage and extensive care of the couple's children.

22. The unreimbursed medical and funeral expenses total $29,729.25. The court agrees plaintiff should receive compensation for these expenses under the damages formula.

23. Finally, plaintiff requests a pecuniary award of $234,000 in lost wages for the rest of decedent's working life. Plaintiff's lost wages figure equals the yearly compensation at her last job prior to the illness multiplied by fifteen—the number of years she would have worked to age 65. Defendant did not contest this computation or any element of damages in its post-trial brief. However, after carefully reviewing the trial testimony, the court determines plaintiff lacks sufficient evidence to carry its evidentiary burden on this part of the damages inquiry.

24. Decedent's past job record and future plans do not support a lost future wages award. Recovery of lost future wages "may not be had where the alleged damages are too conjectural or speculative to form a basis for measurement." *Morris v. Francisco*, 238 Kan. 71, 77, 708 P.2d 498 (1985). This is the case here. The court faces too many imponderables in attempting to formulate a valid lost future wages award. First, the court would have a difficult time in determining what her wages should be for the next fifteen years. A base calculation would be difficult because decedent lacked a strong earnings history prior to her illness. She did not work for almost a year prior to the time of correct diagnosis in 1984. Prior to the nursing home job, she worked in a lower paying position. Moreover, calculations for her wages in the latter years of her working life would be almost impossible. Plaintiff presented no evidence on the earnings of LPNs for 1985 and beyond; his calculation would keep her wages static for fifteen

years. Second, as the court found above, significant doubts exist if she would have returned to work at all. She quit working in 1983 for tax reasons and she made no claim to future employment in her deposition. In sum, the evidence is too speculative to support a claim for lost wages.

25. The total amount of recovery for decedent's loss of life is $24,377 of medical expenses + $5,353.25 of funeral expenses + $100,000 nonpecuniary loss + $1,000,000 pain and suffering award = $1,129,729.25.

26. The second step is to determine the percentage of her total life that decedent lost because of Dr. Tuason's negligence. This step is a more complex task than in the usual case. Her lost chance was not in terms of life expectancy but in a percentage of surviving five years. The court reasons that to adhere to the percentage method described above requires the following calculations. Decedent was forty-eight when the negligent act occurred. Her life expectancy at that age was an additional 32.9 years. PIK § 9.45 (2d ed. 1985 Supp.). Decedent had a significant (51%) chance of living five years. While she may have lived longer than five years, she had a 49% chance of living less than five years. The court determines that five years is the most reasonable amount of time that the negligence deprived her of living. Five years represented 15.2% of her remaining life (5 divided by 32.9). The 15.2% of her remaining life is the loss recoverable under *Roberson.*

27. The final step is to multiply the two figures: the total value of life by the percentage of life lost. Plaintiff recovers $171,718.83 or 15.2% of $1,129,729.25.

IT IS BY THE COURT THEREFORE ORDERED that judgement in the amount of $171,718.83 plus costs is entered in favor of plaintiff.