Rebel Ann MAYS and Everett F. Mays, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 80–K–770.

United States District Court, D. Colorado.

May 10, 1985.

**1477**

FINDINGS OF FACT, CONCLUSIONS
OF LAW AND ORDER

KANE, District Judge.

Plaintiffs' complaint was filed pursuant to 28 U.S.C. § 1346(b) of the Federal Tort Claims Act. It alleged that physicians and other medical staff at Fitzsimons Army Medical Center in Denver, Colorado were negligent in their care and treatment of Rebel Ann Mays. Plaintiffs' original complaint alleged the defendant was negligent in: (1) failing properly to follow up and diagnose the lung cancer Mrs. Mays manifested in January, 1977; (2) rendering substandard treatment and care to Mrs. Mays in the administration of a radiation therapy treatment plan; and (3) failing adequately to inform and disclose to Rebel Ann Mays the various diagnoses, alternative plans for treatment and risks involved in the chosen plan of radiation treatment. The original complaint sought damages for personal injuries and losses sustained by Rebel Ann Mays and further asserted a claim for loss of consortium on behalf of Everett Mays, her husband.

In January 1982, Mrs. Mays died of cancer. In February 1982, plaintiffs' first amended complaint was filed adding a third claim for relief for the wrongful death of Rebel Ann Mays pursuant to the Colorado Wrongful Death Statute C.R.S. 13-21-201 and for damages provided for under the Colorado Survival Statute C.R.S. 13-20-101. The children of Mr. and Mrs. Mays, Michelle Wamboldt, Vikie Averett and Michael Mays were added as plaintiffs by an additional amendment.

### LIABILITY

The following facts were established at trial: Rebel Ann Mays' date of birth was January 31, 1932. She was 44 years of age in January 1977. Mrs. Mays was married on October 31, 1951 to Everett F. Mays. Mr. Mays joined the United States Air Force in 1951 and retired after 23 years of service. Following Mr. Mays' retirement, he and his wife received medical care pursuant to the Civilian Health and Medical

Alan E. Richman, Denver, Colo., for plaintiffs.

Nancy E. Rice, Asst. U.S. Atty., Denver, Colo., for defendant.

Program of the Uniform Services (CHAMPUS).

On January 6, 1977, Mrs. Mays was examined and evaluated at Fitzsimons' outpatient clinic for complaints of voice loss, bronchitis and cough. On that date, chest x-rays were taken which revealed a shaggy round lesion in the left lower lobe of her lungs which by x-ray was estimated to be approximately four (4) centimeters in size. The reviewing radiologist, Major William James Morrison, M.D., noted on his report that further follow-up was required in seven to ten days to exclude the possibility of carcinoma or organizing infarct. Rebel Ann Mays was neither advised by Fitzsimons personnel of the need to return for follow-up examination nor notified of the condition shown on the x-ray. No follow-up examination was conducted by physicians or other personnel at Fitzsimons to rule out the possibility of cancer or infarction.

On March 4, 1977, Rebel Ann Mays returned to Fitzsimons for evaluation of complaints of right-sided neck and shoulder pain. At that time x-rays were taken, however, no action was taken regarding the previous x-ray finding or recommendation for follow-up in January 1977. Mrs. Mays was not contacted by Fitzsimons personnel or medical staff regarding any of the previously noted findings.

On April 14, 1978, Rebel Ann Mays resigned her position as a directory assistance operator with Mountain Bell because she was experiencing persistent fatigue. On April 27, 1978, Rebel Ann Mays was examined as an out-patient at Fitzsimons and evaluated for high blood pressure. Chest x-rays were again requested. The medical records reflect that chest x-rays were not taken until May 23, 1978. These x-rays displayed the same lesion previously evident in the January 1977 x-rays. The lesion located in the left lower lobe of the lung had markedly increased in size and now appeared on x-rays to have grown to an approximate size of five and one-half (5.5) centimeters. Mrs. Mays was apparently asked to return to Fitzsimons on June 1, 1978 for evaluation of several problems including the left lower lobe chest lesion.

She was seen and admitted to the pulmonary service on June 1, 1978.

Diagnostic tests to determine if the lung lesion was cancer were conducted. A thoracotomy and left lower lobectomy were performed to remove the tumor on June 22 1978. The surgery demonstrated lymph node involvement of the bronchial and perihilar nodes. The mediastinal nodes were clinically negative. The pathology report from the surgery revealed that three out of four perihilar nodes were positive for cancer and five out of eight bronchial lymph nodes were positive for cancer. The report also confirmed the mediastinal nodes were negative. The cancer was diagnosed as an adnocarcinoma.

As a result of the positive lymph nodes finding, a course of radiation therapy was recommended. This radiation therapy was a "split course" program in which Mrs. Mays received two weeks of radiation therapy. Radiation treatments were initiated on July 6, 1978 and concluded on September 8, 1978. Following completion of the radiation therapy, Mrs. Mays' initial recuperative period progressed well. On November 17, 1978, Mrs. Mays was seen and reported no complaints, good appetite with no weight loss and was requested to return by the examining physician in five months.

In December 1978 and January of 1979, Mrs. Mays began to experience numbness and tingling in the legs, loss of sensation and a loss of bladder control. In early January 1979, Mrs. Mays found her ability to walk was progressively decreasing because of loss of sensation and muscle control in the lower extremities. Mrs. Mays was admitted to Fitzsimons on January 12, 1979 for evaluation of these signs and symptoms. An initial diagnosis of radiation myelitis was made. There was no treatment for this condition.

She was discharged on January 16, 1979. Her condition progressively deteriorated. She was readmitted to Fitzsimons on March 12, 1979. By this time, she was paralyzed below the mid-chest level. The diagnosis was confirmed as a radiation induced transverse myelitis at the fourth and

fifth thoracic vertebral levels. This was an irreversible condition for which there was no treatment.

On March 22, 1979, Mrs. Mays was transferred by ambulance from Fitzsimons to Craig Rehabilitation Hospital in Denver, Colorado for intensive rehabilitation for paraplegia. She remained at Craig Rehabilitation Hospital until June 15, 1978 when she was discharged to go home. During the time period from mid-June 1979, until May 1980, Mrs. Mays was seen on an outpatient and in-patient basis at Swedish Hospital, Denver, Colorado on numerous occasions for complications, including thrombophlebitis and bronchial infections. Additionally, she received physical therapy during this time.

In the late spring of 1980, Mrs. Mays began to experience respiratory difficulty and congestive heart failure. She was admitted to Porter Memorial Hospital in Denver, Colorado on May 28, 1980 for purposes of evaluating her condition. She had a fluid build-up in the pericardial sac surrounding the heart. Pericardiocentisis, a procedure to remove the fluid, was performed on two occasions to attempt to alleviate this condition. These procedures were unsuccessful. A pericardectomy and debridement of the sternum was performed in June, 1980. The findings at surgery were totally consistent with extreme radiation damage to the tissues of the chest and pericardium. Mrs. Mays had numerous complications following this procedure including respiratory distress requiring a trachostomy and debridement of the sternum and chest tissues. In addition, she developed a decubitis ulcer which had to be surgically corrected.

On July 24, 1980, Mrs. Mays was transferred from Porter Memorial Hospital to Craig Hospital. During this hospitalization, Mrs. Mays was subjected to numerous procedures including surgical debridement of the sternum and corrections of the decubitis ulcer. Mrs. Mays was discharged from Craig Hospital in November, 1980. She returned home for a short period of time, but was readmitted to Swedish Hospital on January 23, 1981 because of a recurrent deep-chest tissue infection.

Mrs. Mays was hospitalized at Swedish until April 16, 1981 during which time numerous surgeries were performed for sternum debridement and closure of the infected wound of the chest. Again, the surgical findings were consistent with extreme radiation damage to the chest tissues and cavity. In December 1981, Mrs. Mays was readmitted to Swedish Hospital for evaluation and potential treatment of a recurrence of her cancer. She received limited therapy, but the cancer at this time was determined to be untreatable. Pursuant to Mrs. Mays' request, she was discharged on January 22, 1982 to return home. She died on January 27, 1982.

The evidence establishes two distinct acts of medical negligence in the care rendered to Mrs. Mays at Fitzsimons Army Medical Center. The first related to the failure to follow-up and diagnose the lung cancer in January 1977. All the medical experts and witnesses who testified agreed that the failure to notify her of the x-ray findings on January 7, 1977 was below the standard of care for out-patient clinical practice in the community at that time. There were multiple failures on the part of Fitzsimons Army Medical Center, including not properly maintaining records, not notifying Mrs. Mays of her condition, and not ensuring appropriate follow-up care of her condition.

Had care in conformity with the applicable standard of care been delivered, timely diagnosis and treatment of the lung cancer would have occurred at minimal cost in late January or early February of 1977. Substandard care was the cause of the delay in the treatment of Rebel Ann Mays' cancer. I find that defendant's care and treatment of Rebel Ann Mays fell below acceptable standards of medical care and as such defendant's care and treatment of plaintiff was negligent. *Larsen v. Linpahl*, 167 Colo. 409, 450 P.2d 77 (1968); *Short v. Downs*, 36 Colo.App. 109, 537 P.2d 754 (1975); *Caro v. Bumpus*, 30 Colo.App. 144, 491 P.2d 606 (1971).

The plaintiff must also establish that the defendant's conduct was the cause of her injury. *Portner v. Swearingen*, 695

F.2d 435 (10th Cir.1982). To establish proximate causation, one must prove with "reasonable probability" that the injury was caused by the defendant's negligence. In this case the substandard care was the cause of the delay in the treatment of Mrs. Mays' cancer. However, this case presents an issue which has not been addressed by Colorado appellate courts. The issue is whether plaintiffs may recover damages when the defendant's conduct was not the cause of the medical condition which caused the injury, but rather was the cause of a substantially increased risk of resulting harm. In this case, the resulting harm was a substantially reduced chance of recovery or survival from the cancer. In other words, are the plaintiffs entitled to recover damages for the negligent failure to diagnose the decedent Rebel Ann Mays' lung cancer and the resultant loss of a chance of recovery. The facts of this case present circumstances for which there is no guidance from Colorado courts.

Historically, the proof of the element of causation in failure to diagnose cases in the medical negligence setting did not permit recovery in cases where the defendant's negligence either substantially increased the risk of resulting harm or substantially reduced the chances for recovery or survival, but the very nature of the disease or ailment precluded testimony based upon "reasonable medical probability" that "but for" the doctors' negligence, the harm would not have resulted. In response to the harshness of the strict application of reasonable medical probability and the difficult cases such as the instant case, courts have carved out the "value of a chance" theory of causation.

The seminal case with respect to the "loss of a chance of survival" theory is *Hicks v. United States*, 368 F.2d 626 (4th Cir.1966). In that case the decedent's estate filed an action under the Federal Tort Claims Act on the theory that death was due to the negligence of a treating physician. The uncontroverted evidence established that if the decedent had been operated on promptly, she would have survived. The defendant's contention was that the decedent's survival, even given appropriate treatment, was not an absolute certainty. In response, the court in *Hicks* stated:

When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chance that he has put beyond the possiblity of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable ... The law does not in the existing circumstances require the plaintiff to show to a certainty that the patient would have lived had she been hospitalized and operated on promptly.

*Hicks v. United States*, 368 F.2d at 632. (Emphasis in original.)

Other courts followed and adopted the reasoning of *Hicks* and permitted the issue of causation in misdiagnosis and failure to diagnose cases to go to the fact finder based on "diminished chances" or "increased risk" without strict application of the "but for" test. Many of these cases have involved failures to diagnose cancer and the diminished chance of survival resulting from the defendant's conduct. For example, in *Jeanes v. Milner*, 428 F.2d 598 (8th Cir.1970), there was a one-month delay in sending lab slides to a pathologist. The slide, when examined by the pathologist showed lymphocarcoma. During that one-month period, the patient progressed from a stage one lymphocarcoma with a 35% chance of survival to a stage two lymphocarcoma with only a 24% chance of survival. Because the delay in diagnosis was prejudicial to the decedent's recovery, the court ruled that this 11% diminution in chance of survival was compensable. The *Hicks* rationale has been adopted in *McBride v. United States*, 462 F.2d 72 (9th Cir.1972). In that case, the court held that when a plaintiff's cause of action rests upon an allegedly negligent failure to give necessary treatment, the absence of positive certainty does not bar recovery if the negligent failure to provide treatment deprived the patient of a significant improvement in his chances for recovery. *Daniels v. Hadley Memorial Hospital*, 566 F.2d

749 (D.C.Cir.1977) again cited *Hicks* with approval and ruled, in a case involving a patient who went into anaphylactic shock and whose chances of survival were reduced by defendant's conduct, that the extent to which the defendant has interfered with these chances must be taken into account.

Similarly, in *James v. United States*, 483 F.Supp. 581 (N.D.Cal.1980) the United States failed to inform plaintiffs of suspected cancer found on a chest x-ray during a pre-employment physical. Two years later when the lung cancer was finally diagnosed, it was inoperable. There was a serious question of whether the tumor was even operable when the misdiagnosis occurred, but plaintiff's expert indicated that the plaintiff had lost a 10% to 15% chance of survival over 5 years. The court commented extensively on the lost chance of benefit from earlier treatment and stated "no matter how small the chances may have been—and its magnitude cannot be ascertained—no one can say that the chance of prolonging one's life or decreasing one's suffering is valueless. 483 F.Supp. at p. 587.

In *Herskovits v. Group Health Cooperative of Puget Sound*, 99 Wash.2d 609, 664 P.2d 474 (1983), the court permitted recovery in a survival action predicated upon the defendant's failure to make a timely diagnosis of the decedent's lung cancer. Expert medical testimony established that if the decedent's tumor was a "stage one" tumor in December 1974 and diagnosed as such at that time, the decedent's chance for survival would have been 39%. Assuming this tumor had progressed to stage two in June 1975, the decedent's chance for survival was 25%. Thus, according to expert medical testimony, the delay in diagnosis reduces the decedent's chance for survival by 14%. The court held that the 14% reduction in the decedent's chance for survival was sufficient evidence of causation to allow the jury to consider the question of whether the failure of timely diagnosis was a proximate cause of death, regardless of the undisputed fact that the decedent had less than a 50% chance of survival at all pertinent times.

The majority of courts which have addressed the loss of a chance theory has permitted compensation for the lost chance of survivability. Rebel Ann Mays sustained just such an injury by virtue of the defendant's negligent medical care. I hold that the plaintiffs have established proximate cause in this case. The defendant caused a substantial reduction in Mrs. Mays' chance of survival.

All physicians who addressed this issue in their testimony acknowledged that the failure to follow-up on the initial x-ray finding in January 1977 was below applicable standards of care and that had appropriate follow-up been conducted, proper diagnosis and probable surgical intervention would have occurred in January or February of 1977. Further, it has been established that because of the approximate 15 to 16 month delay occasioned by defendant's negligence, Mrs. May's chances of survival were reduced by the further spread of the tumor in the lung, bronchial and perihilar nodes and distant metastasis in other areas of the body. Defendant's experts, although unable to render specific opinions regarding survivability, were of the opinion that in general principle Rebel Ann Mays' survivability had been reduced by the delay in treatment.

The plaintiffs' expert in radiation oncology, Dr. Theodore Phillips, was of the opinion that had Mrs. Mays' lung cancer been promptly diagnosed in January of 1977 and had appropriate surgical intervention occurred at that time, Mrs. Mays' chance of survival would have been 40%. Further, Dr. Phillips stated that in his opinion in January 1977, Mrs. Mays had a "stage one" tumor with no lymph node involvement; however, the delay in diagnosis and treatment, as a result of the substandard care rendered by Fitzsimons Army Medical Center, permitted the tumor to progress to "stage two," thereby reducing Mrs. Mays' chance of survival to 15% or less. Accordingly, if proper diagnosis and treatment had been made in January 1977, Mrs. Mays' chance of survival would have been two to three times more likely than was the case in May of 1978. I find that Dr. Phillips' testimony is persuasive.

I find that as a result of the medical negligence in the care rendered at Fitzsimons Army Medical Center, Rebel Ann Mays' chance of survival beyond five years was reduced from 40% to 15%. The plaintiff Everett F. Mays is entitled to recover damages for the reduction in Rebel Ann Mays' chance of survival.

█ The second distinct act of medical malpractice occurred with respect to the radiation therapy administered to Rebel Ann Mays at Fitzsimons Army Medical Center. The testimony of expert witnesses established that the radiation therapy administered to Rebel Ann Mays was below applicable standards of radiation therapy in the community. As a result of the substandard care, Mrs. Mays received radiation doses to the chest, mediastinum, heart and spinal cord in excess of known safe total tolerance levels of radiation to those tissues.

█ This excessive radiation was the cause of Mrs. Mays' paraplegia and injury of the tissues of the chest, sternum and heart. I conclude that the multiple surgeries, hospitalization and medical expenses incurred by Rebel Ann Mays were caused by the negligence of the defendant. I find that the cause of death, however, was the presence of the cancer in the decedent's brain.

## DAMAGES

█ The measure of damages is governed by Colorado's wrongful death statute which employs the principle of net pecuniary loss. The losses are as follows:

█ The parties stipulate that of the $266,300 medical expenses incurred by the Mays family as a result of the defendant's negligence, $195,055 has been paid by the CHAMPUS program under the authority of 10 U.S.C. § 1079. In January 1977, Rebel Ann Mays was 44 years of age and had a life expectancy of 29 years. Mrs. Mays was employed as a directory assistance operator at Mountain Bell and had a work life expectancy from that date of 12 years. Her salary was approximately $183 biweekly. In addition, she received fringe benefits in various forms of health insurance, sick benefits, disability pay, life insurance and telephone concessions. She left her employment at Mountain Bell because of fatigue associated with her lung cancer. Had proper treatment occurred she would have been physically capable of returning to her position as a directory assistance operator. In addition, she provided household services and bookkeeping services for her husband's trucking business. Further, as a result of her disability and the attendant care rendered by Mr. Mays, he was unable to devote the same energy and time to his trucking business, resulting in a substantial reduction in his gross sales and income for the years in which Mrs. Mays was paralyzed and disabled. Further, the plaintiffs Vicki Everett and Michelle Wamboldt, sustained losses of income and time during the time they rendered care and services for their mother. The plaintiffs presented unrebutted evidence of economic losses by Donald P. Stegall, Ph.D., an expert economist. Dr. Stegall computed the total past losses, taking into account personal consumption of Rebel Ann Mays, to be as follows:

| | Past Loss |
|---|---|
| Earnings Capacity (Mrs. Mays) | $ 41,000 |
| Fringe Benefits (Mrs. Mays) | 5,600 |
| Bookkeeping Services (Mrs. Mays) | 9,400 |
| Household Services (Mrs. Mays) | 20,600 |
| Income (Mr. Mays) | 73,700 |
| Home Care (daughters) | 7,600 |
| Medical Expenses | 266,300 |
| Medical Transportation | 800 |
| TOTAL PAST LOSS | $425,000 |

I hold that because of the added negligence involving excessive radiation the entire amount of past loss is not affected by the lost chance issue.[1] Dr. Stegal also testified

---

[1] The past losses are attributable to defendant's negligence both in the failure to give prompt treatment which resulted in the lost chance and in the treatment which caused the paraplegia and other radiation injuries. It would be practically impossible to allocate past losses to the separate instances of negligence. Additionally, such a distinction would be irrelevant. To the extent plaintiffs' past losses are attributable to defendant's negligent treatment, they should be entirely recovered and undiminished by Mrs. Mays' limited life expectancy from the cancer known to exist in January, 1977. To the extent

regarding the future net pecuniary loss from the date of trial. From his testimony I find that had Mrs. Mays not lost the chance of a normal life expectancy she would have future losses as follows:

| | |
|---|---:|
| Earnings Capacity | $ 37,000 |
| Fringe Benefits | 5,100 |
| Bookkeeping | 24,300 |
| Household Services | 106,800 |
| | $173,200 |

■ The per cent of chance lost was 25. Therefore, the damage related to net pecuniary loss caused by defendant is .25 × 173,200 or $43,300. The total net pecuniary loss suffered by the decedent was $468,300. I find that the value of Mr. Mays loss of consortium from January, 1979, to Mrs. Mays' death in January, 1982 is $36,000. The total of damages, therefore, is $504,300.

## COLLATERAL SOURCE

■ In *Kistler v. Halsey*, 173 Colo. 540, 481 P.2d 722, 724 (1971) the Colorado Supreme Court defined the collateral source rule as follows:

> Simply stated, it is that compensation or indemnity received by an injured party from a collateral source, wholly independent of the wrongdoer and to which he has not contributed, will not diminish the damages otherwise recoverable from the wrongdoer.

The phrase "to which he has not contributed" has an ambiguous antecedent, but in view of the Colorado Court of Appeals decision in *Powell v. Brady*, 30 Colo.App. 406, 496 P.2d 328 (1972), *aff'd* 181 Colo. 218, 508 P.2d 1254 (Colo.1973), I find that the "he" referred to is the wrongdoer. Otherwise, the rule makes no sense.

In *Steckler v. United States*, 549 F.2d 1372, 1379 (10th Cir.1977) when considering whether Social Security disability payments are to be regarded as income from a collateral source in a suit against a Veterans Administration Hospital brought under the Federal Tort Claims Act, Judge Doyle said, in *dicta*, "The benefit is unquestionably a non-collateral source which is deductible from an award in that it is derived entirely from government funds and cannot be claimed to originate in any collateral contribution." Judge Doyle, too, noted the dearth of authority in this area. Because the case was remanded, it left unsettled the question of whether the Social Security payments which are contributed to by the employee and employer but supplemented by the government are in whole or in part collateral sources.

■ The benefits furnished to Rebel Ann Mays were health benefits earned by virtue of 20 years of uniformed service by plaintiff Everett F. Mays in the armed forces. CHAMPUS is funded through a separate budgetary allocation by Congress based upon the potential number of beneficiaries. This fund is separate and apart from funds set aside to satisfy judgments under the Federal Tort Claims Act. The funds used by the CHAMPUS program are appropriated funds furnished by the Congress through the Annual Appropriations Act for the Department of Defense and the Department of Health and Human Services (formerly Department of Health, Education and Welfare). 32 C.F.R. § 199.7(e–1) April 14, 1977. Further, federal regulations provide that absent at least 20 years of service in the Armed Forces, service retirees and their dependents do not qualify for CHAMPUS benefits upon retirement. 32 C.F.R. § 199.9 April 14, 1977. Thus, the CHAMPUS benefits are furnished under legisla-

past losses derive from the failure to give prompt treatment and negligent follow-up, plaintiffs' should also recover in full. Plaintiffs have shown that all medical treatment, not necessitated by defendant's affirmative misfeasance, derived from the state of Mrs. Mays' cancer as it was in June, 1978. The cost of Mrs. Mays' treatment in June, 1977, had the original diagnosis and treatment been timely, would have been minimal. Defendant has not rebutted this showing nor shown which, if any, medical expenses would have been incurred irrespective of the distinct malpractice episodes. Other than the cost of an initial x-ray, I doubt that such a showing could ever be made. Thus, all past expense losses were proximately caused by defendant's negligence.

Future net pecuniary loss, however, must be diminished by Mrs. Mays' chance of dying before the occurrence of any of the negligent acts of defendant beginning in January, 1977.

tion wholly separate and distinct from recovery under the Tort Claims Act.

*United States v. Gray*, 199 F.2d 239 (10th Cir.1952), precluded an offset for amounts expended by the Veteran's Administration for the plaintiff's hospitalization against a recovery under the Federal Tort Claims Act. There is no provision under the CHAMPUS legislation which indicates that Congress intended recovery under the Tort Claims Act to be offset or diminished by amounts expended in furnishing hospitalization and medical treatment under the CHAMPUS legislation.

As the Court of Appeals said in *Gray:*
The Veterans Administration furnished to plaintiff the hospitalization and treatment under legislation wholly separate and distinct from the Tort Claims Act. Our attention has not been called to any provision in the Tort Claims Act or in the legislation relating to hospitalization and treatment furnished by the Veterans Administration which indicates that Congress intended for recovery under the Tort Claims Act to be offset or diminished by amounts expended in furnishing hospitalization and treatment for disability. And in the complete absence of an express or clearly implied intent on the part of Congress that such an offset or diminution should be made, it is not the function of this court to effectuate it by judicial fiat. Since the cost of hospitalization and treatment furnished plaintiff could not be asserted by way of offset or diminution of any amount to which plaintiff was entitled under the Tort Claims Act, tendered evidence was properly excluded.

*United States v. Gray*, 199 F.2d 239, 244 (1952). *Gray* has not been overruled. Its facts are comparable to the case at bar. Accordingly, I believe it is incumbent upon me to hold that the collateral source rule is not applicable to this case; it is based on the same Colorado law.

IT IS ORDERED that judgment shall enter in favor of plaintiffs and against defendant in the amount of $504,300 plus interests and costs herein expended.