580 A.2d 206

**Robert N. FENNELL et al.**

v.

**SOUTHERN MARYLAND HOSPITAL CENTER, INC. et al.**

**No. 146, Sept. Term, 1989.**

Court of Appeals of Maryland.

Oct. 9, 1990.

Thomas E. Walker (Greenan, Walker, Steuart & Meng, on brief), Landover, for appellants.

Paul D. Bekman, Scott R. Scherr, Israelson, Salsbury, Clements & Bekman of Baltimore, and John J. Sellinger, Rockville, amicus curiae for Maryland Trial Lawyers Ass'n.

Paul F. Newhouse (Jeri Lynn Balenson, Eccleston and Wolf, on brief), Baltimore, for appellee.

H. Thomas Howell, Kathleen Howard Meredith, Gerard J. Prud'homme, Jeffrey S. Theuer, Semmes, Bowen & Semmes of Baltimore, amicus curiae for Maryland Association of Defense Trial Counsel.

Argued Before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS * and CHASANOW, JJ.

CHASANOW, Judge.

Appellants, Robert N. Fennell, Katrina Lynn Fennell, and Robin Tracy Fennell (the Fennells) are the spouse, children, personal representative, and heirs at law of decedent Cora L. Fennell (Mrs. Fennell). The Fennells filed a medical malpractice claim against Appellee, Southern Maryland Hospital Center, Inc. (the Hospital). Both the Health Claims Arbitration Board and the Circuit Court for Prince George's County granted summary judgment in favor of the Hospital. The Fennells appealed, and this Court granted certiorari prior to consideration by the Court of Special Appeals. Pursuant to Maryland Rule 8–413, the parties agreed to and filed a statement of the case in lieu of the entire record. The relevant facts agreed to by the parties are as follows:

"Early on the morning of July 14, 1981, decedent, Cora L. Fennell, woke up with a severe headache. Appellant, Robert N. Fennell, took his wife to the Emergency Room of [the Hospital]. The Emergency Room records indicate that Cora L. Fennell arrived there at 2:27 a.m. on the morning of July 14, 1981. [Mrs.] Fennell was then seen, examined and treated in the Emergency Room by Roy Kring, M.D. After an initial evaluation, Dr. Kring believed that Mrs. Fennell was suffering from a neurosurgical emergency. He contacted by telephone Ronald Uscinski, M.D., a neurosurgeon, for consultation. Dr. Kring conceded that he was aware at the time he evaluated [Mrs.] Fennell in the Emergency Room that her condition was critical. Drs. Kring and Uscinski were primarily concerned about the possibility of an intracranial bleed,

---

* Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Art. IV, § 3A, he also participated in the decision and the adoption of this opinion.

and it was agreed by these doctors that the patient be transferred to Radiology for a CT Scan. The Hospital chart does not indicate the time that the CT Scan was performed, but it was concluded by Dr. Bach, Plaintiff's expert, that the scan was performed at approximately 3:30 a.m. on the morning of July 14, 1981. Pursuant to the Hospital records, Cora L. Fennell was admitted to the Hospital at 4:00 a.m. on July 14, 1981, and the records note Dr. Uscinski as the admitting physician. The Hospital records further indicate that [Mrs.] Fennell was admitted to the Intensive Care Unit at 5:00 a.m. on the same date. [Mrs.] Fennell arrested at 7:40 a.m. on July 14, 1981, and it was determined by Ronald B. Landman, M.D., who saw her at that time, that she was brain dead. However, she was maintained on life support systems until the early morning hours of July 15, 1981 when she arrested for a second time and was pronounced dead. Although Dr. Uscinski was noted as the admitting doctor on the Hospital chart, [Mrs.] Fennell was not seen by him at any time before she arrested at 7:40 a.m. on the morning of July 14, 1981. [Mrs.] Fennell was not seen by any treating physician at any time between the time she was admitted to the Hospital at 4:00 a.m., and the time she was first seen by internist, Dr. Landman, at approximately 7:30 a.m. on the morning of July 14, 1981, just minutes before she suffered a fatal arrest. The above referenced CT Scan which, according to Dr. Bach, was taken at approximately 3:30 a.m. on the morning of July 14, 1981, ruled out an intracranial bleed and suggested inflammatory process. It was ultimately determined on autopsy that Cora L. Fennell was suffering from meningitis."

In their opposition to the Hospital's motion for summary judgment, the Fennells filed the affidavit of Dr. Michael C. Bach, an infectious disease expert. For the purpose of the motion for summary judgment, the Hospital did not dispute the affidavit. The affidavit established that decedent was suffering from bacterial meningitis. A complication of bac-

terial meningitis is swelling of the brain, a life threatening condition requiring aggressive treatment. Dr. Bach stated that the CT Scan taken at approximately 3:30 a.m. revealed brain swelling and that proper medical treatment required that a lumbar puncture be completed within one-half hour thereafter. He further stated that had decedent been diagnosed and treated in accordance with the appropriate standard of care, she would have had a 40% chance of survival. He concluded that the failure to follow-up the CT Scan with a lumbar puncture and the failure to immediately and aggressively reduce the swelling of the brain that was detected by the CT Scan were violations of the standard of care, and that as a result, the progress of the disease was irreversible. In effect, Dr. Bach established that decedent had a 40% chance of surviving the meningitis, but that the chance was lost as a result of the Hospital's negligence.

Originally, the Fennells filed both a wrongful death action pursuant to Maryland Code (1974, 1989 Repl.Vol.), Courts and Judicial Proceedings Article, § 3–901, *et seq.*, and a survival action pursuant to Md.Code (1974, 1989 Repl.Vol.), Cts. and Jud.Proc.Art., § 6–401. While these claims were before the Health Claims Arbitration Board, this Court decided *Weimer v. Hetrick*, 309 Md. 536, 525 A.2d 643 (1987), in which we held that, in a wrongful death case, a plaintiff must prove to a reasonable medical probability that death was proximately caused by the defendant's negligence.

The Hospital filed a motion for summary judgment citing testimony of plaintiffs' expert that decedent, even if treated in accordance with the appropriate standard of care, still had only a 40% chance of survival. The motion for summary judgment was granted by the Health Claims Arbitration panel chairman, and in the Circuit Court for Prince George's County, summary judgment in favor of the defendant was again entered on both the wrongful death and survival counts. The Fennells, recognizing that *Weimer* is dispositive of the wrongful death claim, have raised on appeal only the summary judgment in the survival claim,

contending that "the Maryland courts have left open the issue of whether loss of chance is compensable in a survival action where the degree of proof that death was caused by negligence does not meet the 'more likely than not' standard."

Loss of chance may include loss of chance of a positive or more desirable medical outcome, loss of chance of avoiding some physical injury or disease, or a loss of chance to survive. Because the instant case involves a loss of chance to survive, when we refer to "loss of chance," we mean decreasing the chance of survival as a result of negligent treatment where the likelihood of recovery from the pre-existing disease or injury, prior to any alleged negligent treatment, was improbable, i.e., 50% or less.

Negligent treatment resulting in a loss of chance of survival may or may not eliminate all chance of survival or recovery. If the chance of recovery is 40%, as in the instant case, the risk of non-recovery must be 60%; and the loss of the 40% chance of recovery increased the risk of non-recovery to 100%. Thus, the loss of a 40% chance of recovery in this case eliminated all chance of recovery. It is also conceivable that negligent treatment may result in loss of a chance of survival without eliminating all chance of survival. For example, if the patient had a 40% chance of recovery and negligent treatment reduced the patient's chance of survival to 10%, then the actual loss of chance of survival would be 30%. By loss of chance, we mean the net loss of chance of survival directly attributable to the negligence.

Loss of chance medical malpractice actions have been recognized in several other jurisdictions, but the cases do not always clearly state the basis for recognizing the cause of action. A number of jurisdictions have adopted the loss of chance doctrine,[1] while others have not clearly resolved

---

**1.** Arizona, *Thompson v. Sun City Community Hosp., Inc.,* 141 Ariz. 597, 688 P.2d 605 (1984); Arkansas, *Jeanes v. Milner,* 428 F.2d 598 (8th Cir.1970); California, *James v. United States,* 483 F.Supp. 581 (N.D.

whether to recognize the doctrine.[2] Still other jurisdictions have refused to recognize the loss of chance doctrine.[3]

Although we have not yet had the issue squarely before us, speculation has arisen whether Maryland will depart from common law principles and recognize a claim for loss of chance in survival actions. *See Cooper v. Hartman,* 311

Cal.1980); District of Columbia, *Daniels v. Hadley Memorial Hospital,* 566 F.2d 749 (D.C.Cir.1977); Hawaii, *McBride v. United States,* 462 F.2d 72 (9th Cir.1972); Iowa, *Sanders v. Ghrist,* 421 N.W.2d 520 (Iowa 1988), and *DeBurkarte v. Louvar,* 393 N.W.2d 131 (Iowa 1986); Kansas, *Boody v. U.S.,* 706 F.Supp. 1458 (D.Kan.1989), and *Roberson v. Counselman,* 235 Kan. 1006, 686 P.2d 149 (1984); Michigan, *Bell v. U.S.,* 854 F.2d 881 (6th Cir.1988), and *Harvey v. Silber,* 300 Mich. 510, 2 N.W.2d 483 (1942); Montana, *Aasheim v. Humberger,* 215 Mont. 127, 695 P.2d 824 (1985); New Jersey, *Evers v. Dollinger,* 95 N.J. 399, 471 A.2d 405 (1984); New York, *Kallenberg v. Beth Israel Hospital,* 45 A.D.2d 177, 357 N.Y.S.2d 508 (1974), *aff'd mem.,* 37 N.Y.2d 719, 374 N.Y.S.2d 615, 337 N.E.2d 128 (1975); Oklahoma, *McKellips v. Saint Francis Hosp., Inc.,* 741 P.2d 467 (Okla.1987); Pennsylvania, *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978); Tennessee, *Truan v. Smith,* 578 S.W.2d 73 (Tenn.1979); Virginia, *Brown v. Koulizakis,* 229 Va. 524, 331 S.E.2d 440 (1985), and *Whitfield v. Whittaker Memorial Hospital,* 210 Va. 176, 169 S.E.2d 563 (1969); Washington, *Herskovits v. Group Health Co-op.,* 99 Wash.2d 609, 664 P.2d 474 (1983); and West Virginia, *Thornton v. CAMC, Etc.,* 305 S.E.2d 316 (W.Va.1983).

2. *See, e.g.,* Colorado, *Mays v. United States,* 608 F.Supp. 1476 (D.Colo. 1985), *but see, Kaiser Foundation Health Plan v. Sharp,* 741 P.2d 714 (Colo.1987); Illinois, *Chambers v. Rush–Pres.–St. Luke's Med. Ctr.,* 155 Ill.App.3d 458, 108 Ill.Dec. 265, 508 N.E.2d 426 (1987), *but see Curry v. Summer,* 136 Ill.App.3d 468, 91 Ill.Dec. 365, 483 N.E.2d 711 (1985) and *Hare v. Foster G. McGaw Hosp.,* 192 Ill.App.3d 1031, 140 Ill.Dec. 127, 549 N.E.2d 778 (1989); Louisiana, *Smith v. State Through Dept. HHR,* 523 So.2d 815 (La.1988), *Bourne v. Seventh Ward General Hosp.,* 546 So.2d 197 (La.Ct.App.1989), and *Hastings v. Baton Rouge Gen. Hosp.,* 498 So.2d 713 (La.1986), *but see Bartley v. Pailet,* 527 So.2d 430 (La.Ct.App.1988) and *Pierre v. Lallie Kemp Charity Hosp.,* 515 So.2d 614 (La.Ct.App.1987).

3. *See, e.g.,* Connecticut, *LaBieniec v. Baker,* 11 Conn.App. 199, 526 A.2d 1341 (1987); Florida, *Gooding v. University Hosp. Bldg., Inc.,* 445 So.2d 1015 (Fla.1984); Indiana, *Watson v. Medical Emergency Services,* 532 N.E.2d 1191 (Ind.Ct.App.1989); Maine, *Phillips v. Eastern Maine Medical Center,* 565 A.2d 306 (Me.1989); New Hampshire, *Pillsbury–Flood v. Portsmouth Hospital,* 128 N.H. 299, 512 A.2d 1126 (1986); New Mexico, *Alfonso v. Lund,* 783 F.2d 958 (10th Cir.1986); and Ohio, *Cooper v. Sisters of Charity of Cincinnati, Inc.,* 27 Ohio St.2d 242, 272 N.E.2d 97 (1971).

Md. 259, 261, 533 A.2d 1294, 1297 (1987) (even if loss of chance doctrine was to be recognized, facts of case did not warrant its application); *Weimer v. Hetrick,* 309 Md. 536, 554, 525 A.2d 643, 652 (1987) (loss of chance damages not recoverable in wrongful death action), *reversing* 67 Md. App. 522, 508 A.2d 522 (1986) (recognizing doctrine); *Chudson v. Ratra,* 76 Md.App. 753, 764–66, 548 A.2d 172, 178–79 (1988), *cert. denied,* 314 Md. 628, 552 A.2d 894 (1989) (doctrine considered but found inapplicable); *Waffen v. U.S. Dept. of Health & Human Services,* 799 F.2d 911, 917 (4th Cir.1986) (pre-*Weimer* dictum that, under Maryland law, "the loss of a substantial chance of survival is a cognizable harm"); *Kroll v. U.S.,* 694 F.Supp. 1210, 1213 (D.Md.1988) (post-*Weimer* prediction that loss of chance will be recognized as element of damages in medical malpractice cases). The doctrine has also received attention in the law reviews. *See* bibliography set forth in *Cooper v. Hartman, supra,* 311 Md. at 264 n. 3, 533 A.2d at 1296 n. 3. *See also* Feldman, *Chances as Protected Interests: Recovery For the Loss of a Chance and Increased Risk,* 17 U.Balt.L.Rev. 139, 158 (1987) (urging recognition of chances as protected interests in Maryland).

In *Weimer v. Hetrick, supra,* this Court held that loss of chance damages were not recoverable in an action brought pursuant to the Wrongful Death Act. In order to recover under that statute, the plaintiff must prove, by a preponderance of the evidence, that the death was caused by the wrongful act of the defendant. Since the issue was not before us, we declined to consider whether loss of chance damages might be recoverable in a survival action. In *Cooper v. Hartman, supra,* we again declined to address the issue of whether loss of chance damages were recoverable in a survival action, but Judge Adkins writing for the Court identified the divergent approaches to the doctrine, stating:

> "The various courts that have adopted these ['loss of chance'] rules ... have taken different approaches. Some have simply relaxed the standards regarding causa-

tion and allowed full compensation for an injury or death where the plaintiff demonstrated less than a 50% chance of recovery. Others have left the traditional rules of causation intact but have viewed the loss of a chance as a way of approaching damages." (Footnotes omitted.) *Cooper*, 311 Md. at 265, 533 A.2d at 1297.

We shall examine both the relaxed causation/new cause of action approach, as well as the new form of damages approach. However, the relaxed causation/new cause of action approach, allowing full recovery for the death, was not advocated by the Fennells.

## RELAXED CAUSATION/NEW CAUSE OF ACTION APPROACH

In the instant case, the circuit court refused to allow loss of chance recovery either as a new cause of action by relaxing traditional rules of causation or, in the alternative, by establishing a new form of damages for loss of chance. On appeal, Appellants do not challenge the refusal to create a new cause of action by relaxing traditional rules of causation. Instead, they argue for loss of chance as a new form of damages. Indeed, they expressly reject the idea of changing traditional principles of causation stating:

"It does not quite seem to make sense to impose upon a Defendant doctor the full responsibility for a patient's death when the patient had a less than even chance of surviving with proper treatment.... A rule allowing recovery for loss of chance ... leaves intact Maryland's traditional principles relating to causation, e.g., no recovery would be allowed *for the death itself* in a case where Plaintiff is unable to prove, by a preponderance of the evidence, that death was proximately caused by the negligence of the Defendant...."

Appellants' Brief at 21–22. For that reason, the relaxed causation/new cause of action approach is not before this Court. It deserves, however, at least a brief discussion.

Courts adopting the relaxed causation/new cause of action approach continue to award "all or nothing" damages,

and when the plaintiff establishes a "substantial possibility" that the doctor's negligence caused the death, there is full recovery. The result is that relaxing the rules of causation merely·improves the plaintiff's odds of receiving all rather than nothing.

The relaxed causation approach in medical malpractice cases has often been attributed to *dictum* in *Hicks v. United States*, 368 F.2d 626 (4th Cir.1966),[4] where Judge Soboleff writing for the Court stated:

> "When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a *certainty* that the patient would have lived had she been hospitalized and operated on promptly." (Citation and footnote omitted.)

*Hicks*, 368 F.2d at 632.

*Hicks* was extensively discussed by this Court in *Weimer v. Hetrick, supra,* where we pointed out that Judge Sobe-

---

4. *See, e.g., Daniels v. Hadley Memorial Hospital,* 566 F.2d 749, 757–58 (D.C.Cir.1977) (full recovery permitted when negligence destroys a substantial possibility of survival); *McBride v. United States,* 462 F.2d 72, 75 (9th Cir.1972) (same; Hawaii law applied); *Jeanes v. Milner,* 428 F.2d 598, 605 (8th Cir.1970) (wrongful death recovery allowed under Arkansas law where misdiagnosis decreased possibility of survival from 35% to 24%); *Kallenberg v. Beth Israel Hospital,* 45 A.D.2d 177, 357 N.Y.S.2d 508, 510–11 (1974) (*per curiam*), *aff'd mem.,* 37 N.Y.2d 719, 337 N.E.2d 128, 374 N.Y.S.2d 615 (1975) (wrongful death recovery permitted where decedent had 20 to 40% chance of survival if medicated promptly); *Whitfield v. Whittaker Memorial Hospital,* 210 Va. 176, 169 S.E.2d 563, 566–67 (1969) (wrongful death recovery when malpractice deprives patient of substantial possibility of survival).

loff's language was at best *dictum* since there was testimony by two experts that the defendant's negligence was the proximate cause of the decedent's death.[5] *Weimer,* 309 Md. at 550–53, 525 A.2d at 650–52.

In addition to the *Hicks dictum,* Section 323 of the *Restatement (Second) of Torts,*[6] which would impose liability where the defendant's negligence increases the risk of harm to another, has sometimes been extended by courts as a justification for relaxing the traditional preponderance standard for proving proximate cause in loss of chance of survival cases.[7]

■ We are unwilling to relax traditional rules of causation and create a new tort allowing full recovery for causing death by causing a loss of less than 50% chance of

---

5. We also pointed out that some of this Court's language in *Thomas v. Corso,* 265 Md. 84, 288 A.2d 379 (1972) was *dictum* and did not alter traditional common law principles of causation.

6. *Restatement (Second) of Torts* § 323 (1965) provides:
   One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
   (a) his failure to exercise such care increases the risk of such harm, or
   (b) the harm is suffered because of the other's reliance upon the undertaking.

7. This Court in *Cooper,* 311 Md. 259, 265 n. 4, 533 A.2d 1294, 1297 n. 4, identified several leading cases in this category: *Thompson v. Sun City Community Hosp., Inc.,* 141 Ariz. 597, 606–09, 688 P.2d 605, 615–16 (1984); *Roberson v. Counselman,* 235 Kan. 1006, 1013–21, 686 P.2d 149, 158–60 (1984); *Evers v. Dollinger,* 95 N.J. 399, 413–15, 471 A.2d 405, 412–15 (1984); *Hamil v. Bashline,* 481 Pa. 256, 269–74, 392 A.2d 1280, 1288–89 (1978). In addition, the "substantial factor" approach was adopted in *DeBurkarte v. Louvar,* 393 N.W.2d 131, 135 (Iowa 1986); *Aasheim v. Humberger,* 215 Mont. 127, 695 P.2d 824, 828 (1985); *McKellips v. Saint Francis Hosp., Inc.,* 741 P.2d 467, 475 (Okla.1987); *Jones v. Montefiore Hospital,* 494 Pa. 410, 431 A.2d 920, 925 (1981); *Herskovits v. Group Health Co-op.,* 99 Wash.2d 609, 664 P.2d 474, 478 (1983) (*en banc*); *Thornton v. CAMC, Etc.,* 305 S.E.2d 316, 324–25 (W.Va.1983). *See also Chambers v. Rush–Pres.–St. Luke's Med. Ctr.,* 155 Ill.App.3d 458, 108 Ill.Dec. 265, 269, 508 N.E.2d 426, 430 (1987).

survival. In order to demonstrate proximate cause, the burden is on the plaintiff to prove by a preponderance of the evidence that "it is more probable than not that defendant's act caused his injury." *Peterson v. Underwood,* 258 Md. 9, 264 A.2d 851 (1970).

> "This does not mean plaintiff is required to exclude every other possible cause of the accident. But where plaintiff by his own evidence shows two or more equally likely causes of the injury, for only one of which defendant is responsible, plaintiff can not recover."

*Id.* at 17, 264 A.2d at 855.

We might also note that in 1986 the General Assembly enacted Md.Code (1974, 1989 Repl.Vol.), Courts and Judicial Proceedings Article, § 3-2A-04(b)(1)(i), which requires dismissal of a malpractice action "if the claimant fails to file a certificate of a qualified expert with the Director attesting to the departure from standards of care, *and that the departure from standards of care is the proximate cause of the alleged injury ...*" (emphasis added). This statute may have manifested a legislative intent that there be a preliminary showing of traditional causation as a prerequisite to filing a medical malpractice claim.

## THE DAMAGE APPROACH TO LOSS OF CHANCE

■ Appellants urge this Court to adopt the loss of chance/damages approach first suggested by Professor King in his law review article King, *Causation, Valuation and Chance in Personal Injury Torts Involving Pre-existing Conditions and Future Consequences,* 90 Yale L.J. 1353 (1981).

In *Cooper v. Hartman, supra,* this Court described the damage approach as leaving "the traditional rules of causation intact," but treating "the loss of a chance as a way of approaching damages." *Cooper,* 311 Md. at 265, 533 A.2d at 1297. The Court quoted a passage from Professor King's law review article which, by coincidence, describes

the same "chance of survival" percentage shown in the instant case:

> "To illustrate, consider a patient who suffers a heart attack and dies as a result. Assume that the defendant-physician negligently misdiagnosed the patient's condition, but that the patient would have had only a 40% chance of survival even with a timely diagnosis and proper care. Regardless of whether it could be said that the defendant caused the decedent's death, he caused the loss of a chance, and that chance-interest should be completely redressed in its own right. Under the proposed rule, the plaintiff's compensation for the loss of the victim's chance of surviving the heart attack would be 40% of the compensable value of the victim's life had he survived (including what his earning capacity would otherwise have been in the years following death). The value placed on the patient's life would reflect such factors as his age, health, and earning potential, including the fact that he had suffered the heart attack and the assumption that he had survived it. The 40% computation would be applied to that base figure." (Footnote omitted.)

*King* at 1382.

Judge McAuliffe, in his concurring opinion in *Weimer, supra*, outlined the damage approach:

> "[A] claim under that theory does not involve the creation of a new tort, but rather involves a redefinition of damages involved in the claim. Traditional principles of law relating to duty, breach, causation, and burden of proof remain the same—what changes is the acceptance of the concept that damages may be recovered for the loss of a chance of survival where that chance is substantial and can be identified and quantified (and thus valued) without resort to conjecture or speculation."

*Weimer*, 309 Md. at 556, 525 A.2d at 653 (McAuliffe, J., concurring).

*Weimer* and *Cooper* discussed, but neither endorsed nor rejected, Professor King's suggestion for loss of chance

damages in survival actions. Several other states have adopted Professor King's damage approach.[8]

A good argument can be made that damages ought to be recoverable when, due to a doctor's negligence, a patient loses a substantial, though less than probable, chance of survival. There are also some arguments against expanding damages in medical malpractice cases to include damages for loss of chance of survival.

Because loss of chance recovery is based on statistical probabilities, it might be appropriate to examine the statistical probabilities of achieving a "just" result with loss of chance damages. In Brennwald, *Proving Causation in "Loss of a Chance" Cases: A Proportional Approach*, 34 Cath.U.L.Rev. 747, 779 n. 254 (1985), the author, citing Orloff and Stedinger's article *A Framework for Evaluating the Preponderance-of-the-Evidence Standard*, 131 U.Pa.L.Rev. 1159 (1983), attempted to analyze statistically the errors produced using traditional tort recovery as compared to the errors produced by loss of chance recovery.

To compare the two rules, assume a hypothetical group of 99 cancer patients, each of whom would have had a 33⅓% chance of survival. Each received negligent medical care, and all 99 died. Traditional tort law would deny recovery in all 99 cases because each patient had less than a 50% chance of recovery and the probable cause of death was the pre-existing cancer not the negligence. Statistically, had all 99 received proper treatment, 33 would have lived and 66 would have died; so the traditional rule would have statistically produced 33 errors by denying recovery to all 99.

The loss of chance rule would allow all 99 patients to recover, but each would recover 33⅓% of the normal value

---

**8.** For cases which adopt King's damages approach, *see e.g. Sanders v. Ghrist*, 421 N.W.2d 520, 523 (Iowa 1988), and *DeBurkarte v. Louvar*, 393 N.W.2d 131, 137 (Iowa 1986); *Boody v. U.S.*, 706 F.Supp. 1458, 1465–66 (D.Kan.1989); *McKellips v. Saint Francis Hosp., Inc.*, 741 P.2d 467, 476–77 & n. 25 (Okla.1987); *Herskovits v. Group Health Co-op.*, 99 Wash.2d 609, 634, 664 P.2d 474, 487 (1983) (Pearson, J., concurring).

of the case. Again, with proper care 33 patients would have survived. Thus, the 33 patients who statistically would have survived with proper care would receive only one-third of the appropriate recovery, while the 66 patients who died as a result of the pre-existing condition, not the negligence, would be overcompensated by one-third. The loss of chance rule would have produced errors in all 99 cases.

Re-defining loss of chance of survival as a new form of damages so that the compensable injury is not the death, but is the loss of chance of survival itself, may really be an exercise in semantics. Loss of chance of survival in itself is not compensable unless and until death ensues. Thus, it would seem that the true injury is the death.

While we should not award damages if there is no injury, the logical extension of the loss of chance damages theory arguably should allow loss of chance damages for negligence, even when the patient miraculously recovers. For example, if a doctor negligently treats a person with a 40% chance of recovery and the doctor's negligence reduces the patient's chance of recovery to only 10%, whether the patient lives or dies, the doctor's negligence cost the patient a 30% loss of chance of survival. If the patient dies, the probable cause of death was the pre-existing disease or injury; it is unlikely that the negligence caused the death. If the patient lives, the negligence clearly did not cause the death. In both scenarios, there was negligence resulting in a 30% loss of chance of survival. If courts are going to allow damages solely for the loss of chance of survival, logically there ought to be recovery for loss of chance regardless of whether the patient succumbs to the un-related pre-existing medical problem or miraculously recovers despite the negligence and unfavorable odds.

Since loss of chance damages are only permitted when the patient dies, it is also arguable that, when we strip away the rhetoric, damages are really being awarded for the *possibility* that the negligence was a cause of the death. Maryland law clearly does not allow damages based

on mere possibilities. *Pennwalt Corp. v. Nasios*, 314 Md. 433, 444, 550 A.2d 1155, 1161 (1988). *See also Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 464 A.2d 1020 (1983).

Another factor weighing against adoption of a loss of chance damages approach is its practical application in civil jury trials. Probabilities and statistical evidence comprise a substantial portion of the evidence submitted to the trier of fact in loss of chance actions. This evidence will generally be in the form of opinions based on statistics that show chance of survival of other individuals similarly situated to the victim. The use of statistics in trials is subject to criticism as being unreliable, misleading, easily manipulated, and confusing to a jury. When large damage awards will be based on the statistical chance of survival before the negligent treatment, minus the statistical chance of survival after the negligent treatment, times the value of the lost life, we can imagine the bewildering sets of numbers with which the jury will be confronted, as well as the difficulties juries will have in assessing the comparative reliability of the divergent statistical evidence offered by each side.

Traditional tort law is based on probabilities. If a patient had a 49% chance of dying from an injury or disease and if the patient was negligently treated and dies, full recovery will be permitted because, absent the negligence, it was more likely than not that the patient would have survived. Based on the 51% probability of surviving the injury or disease, we exclude the injury or disease as the cause of death. Damages are not reduced by the fact that there was a strong possibility that the patient would have died absent the negligence. Conversely, if the patient had a 51% chance of dying from an injury or disease, and was negligently treated and died, it was probably the pre-existing medical condition, not the negligence, that killed the patient, and there is no recovery. Damages must be proven by a preponderance of the evidence. Damages are not proven when it is more likely than not that death was caused by the

antecedent disease or injury rather than the negligence of the physician.

When urged to adopt new theories of causation and/or new elements of tort damages, this Court should be "concerned with the substantial expansion of tortfeasor liability and the accompanying societal costs that will be imposed by this new cause of action." *Gaver v. Harrant,* 316 Md. 17, 31, 557 A.2d 210, 217 (1989).

If loss of chance damages are permitted they would under present case law have to be awarded under a survival action, not a wrongful death action. *Weimer, supra.* Survival action damages currently include conscious pain and suffering as well as medical expenses, but exclude future loss of earnings, solatium damages, and damages which result to other persons from the death. *See Rhone v. Fisher,* 224 Md. 223, 167 A.2d 773 (1961); *Stewart v. United Electric Light & Power Co.,* 104 Md. 332, 65 A. 49 (1906). The determination of whether to recognize loss of chance damages should also include a determination of whether ordinary survival action damages should be expanded in loss of chance cases. These issues are more properly resolved by the legislature.

If loss of chance damages are to be recognized, amendments to the wrongful death statute should also be considered. As a class, medical malpractice plaintiffs benefit from the fact that they are entitled to recover 100% of their damages from a defendant whose negligence caused only 51% of their loss because it is more probable than not that the defendant's negligence caused the loss. Reciprocally, a defendant whose negligence caused less than 50% of a plaintiff's loss pays nothing because it is probable that the negligence did not cause the loss. If a plaintiff whose decedent had a 49% chance of survival, which was lost through negligent treatment, is permitted to recover 49% of the value of the decedent's life, then a plaintiff whose decedent had a 51% chance of survival, which was lost through negligent treatment, perhaps ought to have recovery limited to 51% of the value of the life lost. The latter

result would require a change in our current wrongful death statute.

Loss of chance damages did not exist at common law. In *Gaver v. Harrant, supra,* Chief Judge Murphy noted that this Court has modified the common law when necessary due to changing circumstances or increased knowledge. But, "[a]doption of a new cause of action involves serious public policy concerns." *Id.* at 29, 557 A.2d at 216. "Declaration of the public policy of Maryland is normally the function of the General Assembly." *Harrison v. Montgomery County Board of Education,* 295 Md. 442, 460, 456 A.2d 894, 903 (1983). Recognizing loss of chance damages in a survival action would involve serious public policy concerns. We are not convinced that such a change should be initiated by this Court.

Appellants have not identified any "changing circumstances or increased knowledge" that would necessitate changing traditional common law survival action damage principles. Although there has been a significant increase in medical malpractice litigation in recent years, there is no evidence to suggest that this is due to a significant increase in malpractice by physicians. There is also no reason to believe that health care providers are systematically failing to treat or are improperly treating the critically ill. The legislature is better able to ascertain the reasons for the increase in malpractice claims, and what, if any, remedial action is necessary.

Recognition of loss of chance damages would allow a new form of damages as well as allow medical malpractice claims by an entirely new class of plaintiffs who traditionally have had no cause of action at common law. Patients whose chances of surviving their pre-existing injuries or diseases were 50% or less had no cause of action for negligent treatment under traditional tort principles. Although their chances of survival were decreased, survival was unlikely; and therefore, actual demonstrable harm, in all probability, did not occur. Recognition of this new form of medical malpractice damages for loss of a chance would

undoubtedly cause an increase in medical malpractice litigation, as well as result in an increase in medical malpractice insurance costs.

Since the 1976 enactment of the Health Care Malpractice Claims Act, every subsequent legislative session has devoted considerable time to legislation aimed at managing the soaring costs of malpractice litigation. There is obvious legislative recognition of a public policy of reducing medical malpractice litigation and insurance costs.

. Professor Paul Weiler in his forthcoming book, *Legal Policies for Medical Injuries* (to be published in 1991 by Harvard University Press), points out that expenditures for medical liability insurance in the United States have increased from about sixty million in 1960, to more than seven billion in 1988. The number of tort claims has also risen dramatically from approximately one tort claim per hundred doctors around 1960, to more than one tort claim per ten doctors at the end of the eighties. Weiler Draft at 5.

Consequently, we are not persuaded that the benefits of allowing loss of chance damages in a survival action offset the detriments of a probable increase in medical malpractice litigation and malpractice insurance costs.

JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.

ELDRIDGE, Judge, concurring:

I concur in both the result and the Court's opinion, subject, however, to the following understanding. I do not read the Court's opinion to foreclose reconsideration by the Court of the decision in *Weimer v. Hetrick*, 309 Md. 536, 525 A.2d 643 (1987), in a future case where the issue is properly raised on appeal. In the present case, we have before us only the survival claim. As I understand the opinion, the policy reasons delineated by the Court for refusing to allow recovery of loss of chance damages relate

solely to survival actions. With regard to wrongful death actions, the balance may be struck differently.

All of the opinions in this case recognize that a "good argument can be made that damages ought to be recoverable when, due to doctor's negligence, a patient loses a substantial, though less than probable, chance of survival." If recoverable, those damages would be appropriate in a wrongful death action and not in a survival action. The decision in *Weimer v. Hetrick, supra,* holding that such damages are not recoverable in a wrongful death action, should be reconsidered by this Court in an appropriate case.

Judge COLE has authorized me to state that he joins in this opinion.

McAULIFFE, Judge, concurring.

I concur in the result. I agree with the statement made in the Court's opinion that "[a] good argument can be made that damages ought to be recoverable when, due to a doctor's negligence, a patient loses a substantial, though less than probable, chance of survival." If damages are to be recoverable for such a loss, however, it should not be because the traditional requirement of causation is relaxed. Rather, recovery should be based on recognition that deprivation of a substantial chance of survival is, in itself, a loss which can be valued and compensated.

The damages that should be allowed ought to, as closely as possible, match the value of what has been lost. Allowing only the type of damage that would be recoverable in a survival action would not accomplish that goal. Pecuniary and solatium damages, ordinarily recoverable only in a wrongful death action, must be included if the award is to properly reflect the loss. These damages, would of course, be proportionate to the amount of the chance that was lost.

The Court has held that the statutory cause of action for wrongful death does not permit a claim for damages arising from loss of a chance of survival. *Weimer v. Hetrick,* 309 Md. 536, 554, 525 A.2d 643 (1987). Thus, it is appropriate to

turn first to the legislature for a change in the law relating to recovery of a wrongful death-type damages. Moreover, there are other significant problems and policy decisions to be addressed if recovery is allowed for the loss of a chance of survival, and a comprehensive package of legislation is obviously preferable to piecemeal judicial change in matters of this kind.

ADKINS, Judge, dissenting.

Chiefly because of a theory of damages based on loss of a chance does not meet its test of mathematical precision, the majority rejects that approach to the calculation of damages. I respectfully dissent. Tort law is not about mathematical niceties; it has to do with fairness to fault-free victims who have suffered harm by reason of the tortious acts or omissions of others. It is a basic principle of our tort system that those who can prove they have been so harmed should be compensated. Why should we reject that principle when the harm is loss of a chance of survival that is less than 51%? Is it fair that one who can show that a doctor's negligence had a 51% possibility of producing the harm complained of can recover full damages whereas if the proof is only of a 50% possibility, there can be no recovery whatsoever? Obviously not.

For the reasons stated by Professor King, King, *Causation, Valuation and Chance in Personal Injury Torts Involving Pre-existing Conditions and Future Consequences*, 90 Yale L.J. 1353 (1981). I would allow loss of chance damages in survival actions. *See also, e.g.*, Feldman, *Chances as Protected Interests: Recovery for the Loss of a Chance and Increased Risk*, 17 U.Balt.L.Rev. 139 (1987). Other jurisdictions have done so. *See, e.g., Sanders v. Ghrist*, 421 N.W.2d 520, 523 (Iowa 1988); *DeBurkarte v. Louvar*, 393 N.W.2d 131, 137 (Iowa 1988); *McKellips v. Saint Francis Hosp., Inc.*, 741 P.2d 467, 476–477 & n. 25 (Okla.1987); *Herskovits v. Group Health Co-op.*, 99 Wash.2d 609, 634, 664 P.2d 474, 487 (1983) (Pearson, J.,

concurring); *Boody v. United States,* 706 F.Supp. 1458, 1465–1466 (D.Kan.1989).

The non-mathematical arguments offered by the majority in support of its holding are equally unpersuasive.

The use of statistical evidence is not limited to loss of chance cases. A great deal of evidence, especially medical expert testimony, is based on less than the certainty the majority seems to desire. The elitist notion that Maryland juries would be unable to cope with loss of chance evidence, 320 Md. at 790–791, 580 A.2d at 213–214, surely would surprise those who adopted the second paragraph of Article 23 of our Declaration of Rights.[1]

As to speculation about " 'the substantial expansion of tortfeasor liability and the accompanying societal costs that will be impressed by this new cause of action,' " *Id.* at 792, 580 A.2d at 214 (quoting *Gaver v. Harrant,* 316 Md. 17, 31, 557 A.2d 210, 217 (1989)), the majority should not be so quick to adopt the parade of horribles so facilely conjured up by the defense bar. It is not inevitable that "societal costs" (*i.e.* insurance premiums) would be increased should this approach to damages be applied, or that new floodgates of litigation will open. *See Feldman,* 17 U.Balt.L.Rev. at 150–151. And what of the social cost of failing to compensate those who have been harmed by tortious deprivation of loss of a chance of survival of less than 51%? Even if "social costs" may increase, "that fact alone is not reason enough to deny recovery to a class of plaintiffs that deserves a remedy consistent with the public policy of this State." *Gaver,* 316 Md. at 45, 557 A.2d at 225 (Adkins, J., dissenting).

And despite the majority's assertion to the contrary, 320 Md. at 794, 580 A.2d at 215, adoption of the loss of a chance theory of damages is not contrary to legislative

---

**1.** "The right of trial by jury of all issues of fact in civil proceedings in the several Courts of Law in this State, where the amount in controversy exceeds the sum of five hundred dollars, shall be inviolably observed."

policy. The thrust of legislative policy in the tort claim area has been largely directed to a cap on damages (Courts Article § 11–108), and the elimination of frivolous claims (Courts Article § 3–2A–04(b)). To allow recovery for a properly supported loss of a chance does not conflict with these measures.

Nor is this matter one that must be left solely to the legislature. The majority, as it must, recognizes our power to modify the common law, and suggests that we may do so only when "necessary due to changing circumstances or increased knowledge." 320 Md. at 793, 580 A.2d at 214. In *Adler v. American Standard Corp.*, 291 Md. 31, 42–43, 432 A.2d 464, 471 (1981) we modified the common law by recognizing a cause of action for abusive discharge. We did so largely because of a perceived need to protect employees at will from unfair firing—*i.e.* on the ground of fairness. *Id.* at 42, 432 A.2d at 470. The only changed circumstance we mentioned was that "a growing number of jurisdictions ... have recognized wrongful discharge as a new cause of action." *Id.* at 43, 432 A.2d at 471.

Both of those factors exist here. I would permit a damages claim based on loss of a chance of survival at least above the *de minimis* level. Consequently, I would reverse the judgment of the Circuit Court for Prince George's County.