IN THE SUPREME COURT OF NORTH CAROLINA

No. 241PA19

Filed 18 December 2020

ANITA KATHLEEN PARKES

v.

JAMES HOWARD HERMANN

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision

of the Court of Appeals, 265 N.C. App. 475, 828 S.E.2d 575 (2019), affirming an order

entered on 25 May 2018 by Judge Jesse B. Caldwell III in Superior Court, Lincoln

County, granting defendant's motion for summary judgment. Heard in the Supreme

Court on 1 September 2020.

*Melrose Law, PLLC, by Mark R. Melrose and Adam R. Melrose, for plaintiff-appellant.*

*Roberts & Stevens, P.A., by Phillip T. Jackson, David C. Hawisher, and Elizabeth Dechant, for defendant-appellee.*

*D. Hardison Wood and Charles Monnett III for North Carolina Advocates for Justice, amicus curiae.*

*John H. Beyer and Katherine H. Graham for North Carolina Association of Defense Attorneys, amicus curiae.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP, by Christopher G. Smith, for North Carolina Chamber Legal Institute, amicus curiae.*

*Linwood Jones for North Carolina Healthcare Association, amicus curiae.*

*Norman F. Klick Jr., Jerry A. Allen, and Jocelyne Riehl for North Carolina Medical Society and North Carolina College of Emergency Physicians, amici curiae.*

NEWBY, Justice.

In this case we are asked to change our existing jurisprudence regarding proximate causation and to establish a new cause of action, "loss of chance." We decline to make these significant changes because they are best left to the legislative branch. Specifically, this case is about whether a patient who experienced a stroke failed to show, more likely than not, that the physician's negligence caused her diminished neurological function. Further, this case raises the question of whether the patient's "loss of chance" at a better outcome following her stroke is a separate type of injury for which she could recover in medical malpractice action. Plaintiff concedes that she failed to show that it was more likely than not that defendant's negligence caused her diminished neurological function. Nonetheless, plaintiff argues her claims should stand because defendant's negligence diminished her likelihood of full recovery, thus proximately causing her injury. Further, plaintiff argues that her "loss-of-chance" claim is a separate claim. We now affirm the decision of the Court of Appeals, which affirmed the trial court's decision to grant summary judgment to defendant.

Because the trial court granted summary judgment, we review the facts in the light most favorable to plaintiff, the nonmoving party. As alleged in plaintiff's complaint, at approximately 12:15 a.m. on or about 24 August 2014, plaintiff told her husband she thought she might be having a stroke as "her left arm and left leg felt heavy and weak and . . . her tongue felt thick and her speech was slurred." Her family

rushed her to the nearby hospital. By approximately 1:35 a.m. plaintiff was in triage at the hospital complaining of slurred speech and numbness in her left arm, symptoms that had started about one hour earlier. Plaintiff received a CT scan of her head at approximately 1:35 a.m., and those results were available soon after. At approximately 3:00 a.m. defendant contacted plaintiff's primary care physician, Dr. Wheeler, and erroneously communicated that plaintiff "had no neurological deficits." Plaintiff's same symptoms continued and at about 6:00 a.m. the hospital staff noted that plaintiff "had left facial droop, left arm drift and slightly slurred speech." At approximately 7:15 a.m. Dr. Wheeler arrived at the hospital, noted plaintiff's neurological signs and symptoms, ordered a neurological consult, and admitted plaintiff to the hospital. After the neurological consult, Dr. Wheeler spoke with the neurologist who advised her that plaintiff's opportunity to benefit from certain time-sensitive treatment, namely administering alteplase, a tissue plasminogen activator ("tPA"), had passed.

In her complaint, plaintiff alleged that, "[d]ue to the delay in diagnosis, the Plaintiff has suffered additional harms, damages and losses, including permanent injuries, and including additional medical expenses for which the Defendant is liable." Plaintiff claimed defendant "was negligent and failed to use reasonable care and diligence" to timely diagnose plaintiff's stroke using the methods and techniques available, assess and reassess plaintiff's conditions which demonstrated the signs of an ongoing stroke, and timely treat plaintiff with tPA. Plaintiff alleged that her injury

was "a direct and proximate result" of defendant's negligence and, "[h]ad timely and appropriate medical care been provided to the Plaintiff, then her ultimate medical outcome would have had an increased opportunity for an improved neurological outcome." This secondary claim, that plaintiff lost an increased opportunity for an improved neurological outcome by defendant's failure to timely treat her with tPA, is referred to as plaintiff's loss-of-chance claim.

Defendant moved for summary judgment, arguing that the stroke caused plaintiff's injuries, not defendant's failure to treat plaintiff with tPA, and that plaintiff's loss-of-chance claim is not a recognized claim in North Carolina. The trial court, having reviewed the pleadings, depositions, and memoranda of law submitted by both parties, granted summary judgment in favor of defendant.

On appeal, a unanimous panel of the Court of Appeals acknowledged that plaintiff's injury was proximately caused by the stroke and not by defendant's negligence. *Parkes v. Hermann*, 265 N.C. App. 475, 477, 828 S.E.2d 575, 577 (2019). The evidence in the light most favorable to plaintiff only showed a 40% chance that defendant's negligence caused plaintiff's injury. In other words, there was only a 40% chance that plaintiff's condition would have improved if defendant had properly diagnosed plaintiff and timely administered tPA. *Id.* By presenting evidence of only a 40% chance, plaintiff failed to show it was more likely than not that defendant's negligence caused plaintiff's current condition. *Id.*

Plaintiff also claimed that the loss of the 40% chance itself was a cognizable

and separate type of injury—her loss of chance at having a better neurological outcome—that warranted recovery. *Id.* at 478, 828 S.E.2d at 577–78. The Court of Appeals discussed that a plaintiff cannot recover for a loss of less than a 50% chance under "the 'traditional' approach" applied to loss-of-chance claims in other jurisdictions, but a plaintiff may recover the full value of a healthier outcome if he or she can show that, more likely than not, the outcome could have been achieved absent the defendant's negligence. *Id.* at 478, 828 S.E.2d at 578 (citing *Valadez v. Newstart, LLC*, No. W2007-01550-COA-R3-CV, 2008 WL 4831306, at *4 (Tenn. Ct. App. Nov. 7, 2008)). Here plaintiff's loss was at best a 40% chance; thus, plaintiff could not recover under this traditional approach.

Regardless, relying in part on this Court's precedent in *Gower v. Davidian*, 212 N.C. 172, 193 S.E. 28 (1937), the Court of Appeals stated that this Court had not adopted "loss of chance" as a separate cause of action, *Parkes*, 265 N.C. App. at 478, 828 S.E.2d at 578, and concluded that "any change in our negligence law lies 'within the purview of the legislature and not the courts,' " *id.* at 478–79, 828 S.E.2d at 578 (quoting *Curl v. Am. Multimedia, Inc.*, 187 N.C. App. 649, 656–57, 654 S.E.2d 76, 81 (2007)). Thus, the Court of Appeals affirmed the trial court's order granting summary judgment in favor of defendant. *Id.* at 479, 828 S.E.2d at 578.

Summary judgment is proper if "there is no genuine issue as to any material fact and . . . any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2019). "The movant is entitled to summary judgment . . . when only a

question of law arises based on undisputed facts." *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 334, 777 S.E.2d 272, 278 (2015) (citation omitted). "All facts asserted by the [nonmoving] party are taken as true [and] . . . viewed in the light most favorable to that party." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000). "This Court reviews appeals from summary judgment de novo." *Ussery*, 368 N.C. at 334–35, 777 S.E.2d at 278 (citation omitted).

Here plaintiff's filings and discovery showed that for tPA to be possibly beneficial, it must be administered within three hours of the onset of a certain kind of stroke. A medical study reviewed by plaintiff's expert showed that stroke patients who receive placebo treatment, or in other words are not treated with tPA, have roughly a 20% to 26% chance of a good neurological outcome, such as a full or nearly full recovery. Those patients who receive the treatment add an additional thirteen percentage points to their chance of recovery, resulting in a 39% total chance of a good neurological outcome. Based on the expert's testimony, with the treatment also comes a certain degree of risk, dependent on the patient, with a 6.4% risk of doing harm. According to plaintiff's expert, plaintiff "had an opportunity for [a] maximum benefit of 35 [percent]—well, according to the trial, I say about 30 to 35, the trial is up to 39 percent, but yes, under 40 percent."[1] Plaintiff claims that these percentages represent

---

[1] The Court of Appeals assumed a 40% total chance of an improved neurological outcome when viewing the evidence in the light most favorable to plaintiff. *See Parkes*, 265 N.C. App. at 477, 828 S.E.2d at 577.

the lost chance of an increased opportunity for an improved neurological outcome had tPA been administered in time and constitute a compensable injury separate from traditional negligence.

As determined by the Court of Appeals, neither the additional thirteen percentage points, the 30% to 35% total chance, nor the 40% total chance of an improved neurological outcome meets the "more likely than not," or greater than a 50% chance, threshold for proximate cause in a traditional medical malpractice claim. But, plaintiff argues that the loss-of-chance claim is appropriate when a plaintiff cannot meet the greater than a 50% threshold, thereby allowing a plaintiff to present a loss-of-chance claim to the jury when a traditional negligence claim may not survive summary judgment. Plaintiff advocates for lowering the proximate cause standard for cases like this one because the loss of chance for an improved outcome, whether it be the additional thirteen percentage points, the 30% to 35% total chance, or the 40% total chance of an improved neurological outcome, represents a compensable injury separate from a traditional medical malpractice claim. Plaintiff maintains that advances in medicine allow these percentages to translate to calculable damages. The issue presented to this Court is whether losing the chance for an increased opportunity for an improved outcome is a cognizable and compensable claim in North Carolina. We hold that it is not.

In *Gower*, the plaintiff sustained a neck fracture during a motor-vehicle accident. 212 N.C. at 173, 193 S.E. at 29. This Court considered whether a physician

was negligent in failing to timely diagnose the neck fracture, which resulted in about a thirteen-day delay in diagnosis. *Id.* at 174, 193 S.E. at 29. The plaintiff argued that the delay in the diagnosis caused the fracture to develop a callus, preventing it from being set properly once diagnosed. *Id.* at 174, 193 S.E. at 29–30. To have the opportunity to present his case to the jury, "the burden rested upon the plaintiff to offer evidence tending to show a causal connection between his injury and the negligent conduct of the defendant." *Id.* at 175, 193 S.E. at 30.

In an attempt to show that causal connection, the plaintiff offered testimony of an expert witness who opined "that had this case received immediate attention and had that fracture and dislocation reduced, his chances for further recovery, or for perfect recovery, would have been much greater." *Id.* "Analyzing this statement," the Court "found [it] to be entirely conditional." *Id.* The expert opinion simply failed to establish proximate cause between the defendant's delay in diagnosis and the injury sustained by the plaintiff: "His opinion in this respect is based entirely upon an actual reduction of the fracture, which the evidence discloses could not be reduced, and he merely says that the chances for further recovery would have been much greater. The rights of the parties cannot be determined upon chance." *Id.* at 176, 193 S.E. at 30. In short, the injury sustained by the plaintiff was attributable to the motor-vehicle accident rather than a delay in diagnosis. *See id.* In the light most favorable to the plaintiff, the expert testimony that the plaintiff would have had an improved chance of recovery if certain facts were true was inadequate. *Id.* The loss of that chance was

not a compensable injury that could support a negligence claim. *Id.* at 176, 193 S.E. at 30–31.

Even if the Court in *Gower* did not outright reject what is today called a loss-of-chance claim, it firmly framed medical malpractice claims within the confines of traditional proximate cause, which allows a negligence claim to proceed when the evidence shows that the negligent act more likely than not caused the injury. If the evidence falls short of this causation standard, then there is no recovery. The Court did not relax the proximate cause requirement for a medical malpractice claim when presented with the opportunity. *See, e.g., Buckner v. Wheeldon*, 225 N.C. 62, 65, 33 S.E.2d 480, 483 (1945) (A physician is liable "only when the injurious result flows proximately" from the physician's negligence.). Under a lesser standard, a plaintiff alleging medical malpractice need only offer evidence tending to show that the defendant's negligence "possibly" caused his injury, rather than "probably" caused it. Such a standard would create an anomaly in medical malpractice actions. Moreover, damages for a possible chance simply cannot fit within our traditional framework.

Here the evidence showed that if plaintiff had received the tPA medication in time and if the tPA medication had worked in her favor, then her chances for a better recovery would have been greater. The expert's opinion relied on the assumption that the tPA medication would have improved plaintiff's condition. To reach plaintiff's desired result would require a departure from our common law on proximate causation and damages since a loss-of-chance claim would award for the possibility

that defendant's negligence contributed to plaintiff's condition. We decline to do so. Such a policy judgment is better suited for the legislative branch of government.[2] *See Henson v. Thomas*, 231 N.C. 173, 176, 56 S.E.2d 432, 434 (1949). Accordingly, the trial court properly granted summary judgment to defendant. We affirm the holding of the Court of Appeals.

AFFIRMED.

---

[2] The General Assembly has already modified the common law in this area and is certainly equipped to do so again if it so desires.

Justice EARLS dissenting.

Early in the morning on 24 August 2014, plaintiff Anita Parkes began experiencing concerning neurological symptoms.[1] She believed she was having a stroke. Her family rushed her to Highlands-Cashiers Hospital. Dr. Hermann, an emergency physician, evaluated her at 1:47 a.m., approximately one and a half hours after the initial onset of her neurological symptoms. Ms. Parkes complained of left arm weakness and slurred speech. Defendant called Ms. Parkes' primary care physician and said that Ms. Parkes' speech was slurred but that he "was not seeing it." He attempted to discharge plaintiff from the hospital, but her family protested, and Dr. Hermann agreed to keep her overnight "for observation." The following morning, Ms. Parkes' family returned to the hospital, where they found Ms. Parkes laying on a stretcher in the emergency-room area suffering from obvious facial drooping. It would later be determined that plaintiff had suffered an acute ischemic stroke.

The standard of care for treating a patient who incurs an ischemic stroke is to

---

[1] At the motion for summary judgment stage, "[a]ll facts asserted by the adverse party are taken as true, and their inferences must be viewed in the light most favorable to that party." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000) (citations omitted). Accordingly, on appeal, we consider the facts as alleged by Ms. Parkes to be true. *Summey v. Barker*, 357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003) ("On appeal of a trial court's allowance of a motion for summary judgment . . . [e]vidence presented by the parties is viewed in the light most favorable to the non-movant.").

administer alteplase, a tissue plasminogen activator (tPA), which is the only known FDA-approved treatment for this condition. A patient who receives tPA within three hours of the onset of neurological symptoms has an approximately 30%–35% chance of ultimately experiencing improved neurological functioning. While administering tPA is not without risk, a patient who receives tPA has a measurably better chance of recovery than a patient who does not receive the treatment. Sadly, Ms. Parkes did not recover, and she continues to suffer neurological symptoms to this day, including severely impaired functioning on the left side of her body.

As alleged by Ms. Parkes, if Dr. Hermann had administered tPA at or around the time he initially examined her, she would have had a significantly better chance of recovering from her stroke. Ms. Parkes asserts that she lost her chance of recovery due to Dr. Hermann's failure to adhere to the appropriate standard of medical care. Our decision today denies Ms. Parkes the opportunity to seek to hold Dr. Hermann liable for the consequences of his assertedly negligent actions. According to the majority, this result is necessary because Ms. Parkes "failed to show that it was more likely than not that defendant's negligence caused her diminished neurological function." The majority is correct that, in North Carolina, a plaintiff who brings a common law negligence claim has the burden of proving a probabilistic connection between his or her alleged injury and the defendant's purportedly negligent conduct. *See Phelps v. City of Winston-Salem*, 272 N.C. 24, 30, 157 S.E.2d 719, 723 (1967) ("If the connection between negligence and the injury appears unnatural, unreasonable

and improbable in the light of common experience, the negligence, if deemed a cause of the injury at all, is to be considered a remote rather than a proximate cause.") Ms. Parkes concedes that the scientific evidence cannot support the conclusion that Dr. Hermann's failure to administer tPA was more likely than not the cause of the neurological symptoms she continues to experience. Nevertheless, she asserts that she can carry her burden by showing that Dr. Hermann's negligent conduct more likely than not caused her to lose her chance of recovering from the stroke.

In so arguing, Ms. Parkes urges us to adopt the "loss of chance" doctrine, which has been recognized by courts applying the common law of negligence in no less than twenty-five jurisdictions. *See* Lauren Guest, David Schap & Thi Tran*, The "Loss of Chance" Rule as a Special Category of Damages in Medical Malpractice: A State-by-State Analysis,* 21 J. Legal Econ. 53, 58–60 (2015) (reviewing case law as of 2014 and concluding that 41 states had addressed loss of chance, with 24 states having adopted some version of the doctrine).[2] Under the loss of chance doctrine, the injury that Ms. Parkes seeks redress for is not her diminished neurological functioning.[3] Instead, Ms.

---

[2] Since then, the Oregon Supreme Court has also recognized the loss of chance doctrine. *Smith v. Providence Health & Servs.-Oregon*, 361 Or. 456, 393 P.3d 1106 (2017).

[3] In stating that Ms. Parkes "advocates for lowering the proximate cause standard," the majority appears to conflate two distinct theories of recovery—one that does argue for relaxing the proximate cause standard to allow a plaintiff to recover directly for his or her physical injuries even if there is a less than 50% chance that the injuries were caused by a defendant's negligent conduct and one that argues for leaving the proximate causation standard unaltered but defining the plaintiff's lost chance of recovery as a distinct, cognizable category of injury. Plaintiff advocates for the latter, which still requires a showing that the defendant's conduct was the proximate, probable cause of the plaintiff's injury. I examine the merits of Ms. Parkes' argument on the basis of this theory alone.

Parkes asserts that Dr. Hermann's negligent conduct deprived her of the opportunity to recover from her ischemic stroke. In other words, Ms. Parkes claims that due to Dr. Hermann's failure to administer tPA, she lost the 30%–35% chance of an improved outcome that she would have enjoyed if Dr. Hermann had adhered to the standard of care. Even under this theory, Ms. Parkes must still satisfy the four elements of a common law negligence claim: she must show that "(1) the defendant owed the plaintiff a duty of care; (2) the defendant's conduct breached that duty; (3) the breach was the actual and proximate cause of the plaintiff's injury; and (4) damages resulted from the injury." *Parker v. Town of Erwin*, 243 N.C. App. 84, 110, 776 S.E.2d 710, 729–30 (2015) (citation omitted). The only difference is that in a loss of chance claim, the injury is defined as the plaintiff's diminished opportunity to recover due to the defendant's negligent conduct, not the plaintiff's physical condition itself. *See Delaney v. Cade*, 255 Kan. 199, 215, 873 P.2d 175, 185 (1994). ("In an action to recover for the loss of a chance to survive or for the loss of a chance for a better recovery, the plaintiff must first prove the traditional elements of a medical malpractice action by a preponderance of the evidence."). On this theory, Ms. Parkes argues her claim should survive defendant's motion for summary judgment because she has alleged that (1) Dr. Hermann owed her a duty of care when he treated her in the emergency room, (2) Dr. Hermann's failure to diagnose her stroke and administer tPA breached that duty, (3) Dr. Hermann's actions were the actual and proximate cause of her foregone 30%–35% chance of recovering from the stroke, and (4) damages

resulted from her lost chance of recovery.

To date, North Carolina courts have not recognized a common law negligence claim under the loss of chance theory Ms. Parkes advances in the present case. Despite the majority's characterization of our precedents, this Court has never squarely considered the loss of chance doctrine. Ms. Parkes does not ask this Court to allow her claim as an exercise of sound policy judgment, nor does she ask us to invent a new cause of action. Instead, Ms. Parkes invites this Court to do something it routinely and necessarily does: she invites us to adapt and apply common law principles to evolving conditions and new factual circumstances. *See, e.g.*, *Young v. W. Union Tel. Co.*, 107 N.C. 370, 385, 11 S.E. 1044, 1048 (1890) (recognizing for the first time that "mental anguish is actual damage"); *Jackson v. Bumgardner*, 318 N.C. 172, 178, 347 S.E.2d 743, 747 (1986) (recognizing for the first time that pregnancy can be a kind of legal injury); *Hart v. Ivey*, 332 N.C. 299, 305, 420 S.E.2d 174, 178 (1992) (recognizing for the first time "a common law negligence claim against a social host for serving alcoholic beverages"). Indeed, when this Court abolished the doctrine of charitable immunity in 1967, it looked to how the common law had been evolving in other states, quoting with approval the following observation from an opinion of the Oregon Supreme Court which abandoned the rule in 1963:

> [I]t is neither realistic nor consistent with the common-law tradition to wait upon the legislature to correct an outmoded rule of case law. . . . Negligence law is common law. . . . The fact that a rule has been followed for fifty years is not a convincing reason why it must be followed for

> another fifty years if the reasons for the rule have ceased
> to exist. . . . Tort law in 1963 differs from tort law in 1863
> for the most part because of the work of the courts. When
> courts have recognized the need for remedies for new
> injuries, the remedies have been found.

*Rabon v. Rowan Mem'l Hosp., Inc.,* 269 N.C. 1, 15, 152 S.E.2d 485, 494 (1967) (alterations in original) (quoting *Hungerford v. Portland Sanatorium & Benev. Ass'n,* 235 Or. 412, 414–15, 384 P.2d 1009, 1010–11 (1963)).  This Court has an obligation to do justice when interpreting the common law.  *See, e.g., State v. Jones*, 367 N.C. 299, 313, 758 S.E.2d 345, 354 (2014) ("The common law 'is not inflexible, and therefore we will not hesitate to abandon a rule which has resulted in injustices, whether it be criminal or civil.' "); *Nelson v. Freeland,* 349 N.C. 615, 632, 507 S.E.2d 882, 892–93 (1998) ("Nonetheless, we also are aware that '[i]t is the tradition of common-law courts to reflect the spirit of their times and discard legal rules when they serve to impede society rather than to advance it.' "). Abdicating our responsibility, as the majority does here, based on a vague, legally unsupported intuition that this decision should be made by the legislature is just as improper as overriding a legislative enactment to implement a different policy option. The possibility that the legislature could act in an area of the common law in which it has not yet enacted legislation is an excuse, not a reasoned explanation for eschewing our judicial duty, no matter how strenuously the majority invokes the need for deference to our coordinate branch of government.

Ultimately, I do not believe that the harsh result of denying Ms. Parkes the

opportunity to hold Dr. Hermann liable for his negligent conduct is compelled by our precedents, by "traditional" principles of tort law, or by the separation of powers. Instead, I agree with the courts in the majority of jurisdictions which have examined the loss of chance doctrine and concluded that claims like Ms. Parkes' are cognizable. Accordingly, I dissent and would permit Ms. Parkes to present her claim to a jury on the theory that her lost chance of recovering from her ischemic stroke is a cognizable injury.

Both the Court of Appeals and the majority erroneously state that recognizing the loss of chance doctrine would create tension with this Court's settled precedents. The precedents the Court of Appeals and the majority rely upon are simply irrelevant to the issue before this Court today. First, *Gower v. Davidian*, 212 N.C. 172, 193 S.E. 28 (1937), did not "outright reject what is today called a loss of chance claim," nor did it "firmly frame[ ] medical malpractice claims within the confines of traditional proximate cause." A close reading of *Gower* demonstrates that it is neither controlling nor persuasive authority because the evidence presented in that case conclusively defeated plaintiff's negligence claim under any theory of injury.

The plaintiff in *Gower* was injured in an automobile accident. *Id.* at 173, 193 S.E. at 29. On the day of the accident, the plaintiff was admitted to a hospital, where he was examined by the defendant. *Id.* at 173–74, 193 S.E. at 29. At the summary judgment stage, the Court accepted as alleged that the defendant had failed to conduct a thorough physical examination before discharging the plaintiff to his home

without treatment. *Id*. Less than two weeks after the accident, the plaintiff was admitted to Duke Hospital, where physicians diagnosed him with a fractured neck. *Id*. at 174, 193 S.E. at 29. Surgeons at Duke Hospital attempted to reset the fracture, but "[d]ue to the condition and location of his injury it was impossible to apply sufficient traction to reset the bone, and [the plaintiff suffered] a permanent injury." *Id*. Subsequently, the plaintiff filed suit against the defendant seeking damages for the defendant's assertedly negligent failure to appropriately diagnose and treat the plaintiff's neck fracture. *Id*.

At trial, the plaintiff's expert witness testified that "had that fracture and dislocation been replaced, put in proper position immediately it would have been much easier [to fix], but to wait until after two weeks it would be almost impossible to replace it owing to callus." *Id*. at 175, 193 S.E. at 30. In modern parlance, the expert witness testified that the standard of care for resetting fractures demanded an attempt to reset the bone within two weeks. *Id*. After two weeks, the risk of calluses forming significantly diminished the likelihood that treatment would be successful. *Id*. It was undisputed that the defendant did not attempt to reset the plaintiff's fracture. *Id*. However, the plaintiff still received a thorough examination by physicians at Duke Hospital within two weeks of his injury. *Id*. The physicians determined that the fracture could not be reset, but it was not because calluses had formed. As the Court explained, "[a]ll the evidence tends to show that [a] callus does not develop to an extent that would interfere with the resetting of a fracture within

a minimum of two weeks, and that there was no evidence of [a] callus around the fracture of plaintiff's neck which would impede or interfere with the resetting of the bone [at the time he was examined at Duke Hospital]." *Id.* The evidence established that the plaintiff's chances of recovery were the same on the day he was appropriately treated by the Duke Hospital physicians as they were on the day the defendant negligently failed to adhere to the standard of care. *Id.* at 176, 193 S.E. at 30–31. The fact that the Duke Hospital physicians could not reset the plaintiff's fracture resulted from "the condition and location of his injury," not because of the time that had elapsed between the defendant's examination and the examination conducted by the Duke Hospital physicians. *Id.* at 174, 193 S.E. at 29. Accordingly, the defendant could affirmatively prove that his actions had no impact on either the plaintiff's actual recovery or his chances of recovering. *Id.*

> The evidence discloses that the use of modern equipment and methods by trained and skillful surgeons at a time when callus had not developed [e.g., within two weeks of incurring the fracture] sufficiently to interfere with proper setting of the bone has availed nothing. The character and location of the fracture is such that proper traction cannot be successfully used. Unfortunately, upon this record as it now appears, the plaintiff has suffered an injury that *could not then and cannot now* be relieved by the medical profession, except by performing a most dangerous operation. *There is no evidence of any injury which the plaintiff sustained by reason of the delay of less than two weeks caused by the alleged conduct of the defendant.* In so far as plaintiff's right to recover is concerned, what boots it that the defendant did not make a thorough clinical and X-ray examination? Plaintiff's unfortunate condition results from his own act and not

from any negligent conduct of the defendant.

*Id.* at 176, 193 S.E. at 30–31 (emphases added).[4] Unlike the plaintiff in *Gower*, Ms. Parkes did not receive appropriate treatment within the time period prescribed by the applicable standard of care.

These facts help contextualize this Court's statement in *Gower* that "[t]he rights of the parties cannot be determined upon chance." *Id.* at 176, 193 S.E. at 30. Of course, the "rights of the parties" are, to some extent, "determined upon chance" in every medical malpractice case. Any individual patient's right to hold a physician liable for negligent conduct inevitably depends on circumstances out of either parties', or any parties', forecast and control.[5] Denying Ms. Parkes an opportunity to bring her loss of chance claim to a jury will not purge "chance" from North Carolina's medical malpractice law. Instead, our statement that "[t]he rights of the parties cannot be determined upon chance" only refers to the nature of the evidence required to

---

[4] To analogize the facts of *Gower* to the present case, it would be as if thirty minutes after Dr. Hermann initially examined Ms. Parkes, a second physician examined her, correctly diagnosed her stroke, and administered tPA within three hours of the onset of her neurological symptoms. If Ms. Parkes failed to recover despite receiving tPA within the three-hour window, a court could ascertain that Dr. Hermann's negligent failure to diagnose and treat Ms. Parkes had not deprived her of an opportunity to recover from her stroke.

[5] For example, imagine that Treatment X is the only available treatment for Condition Y. When administered, Treatment X is effective for 80% of patients who suffer from Condition Y. If left untreated, Condition Y is fatal for 90% of patients and inconsequential for all others. If a physician negligently fails to administer Treatment X to a patient suffering from Condition Y, the "rights of the parties" will be fixed by "chance"—the 20% chance that the patient would not have recovered even if she had received Treatment X (creating liability for an action that did not contribute to the patient's death) or the 10% chance that the patient will recover without treatment (absolving liability for an otherwise negligent act).

establish a causal link between a defendant's conduct and a plaintiff's alleged injury. *See Shumaker v. United States*, 714 F. Supp. 154, 163 (M.D.N.C. 1988) ("The supreme court's principal concern [in *Gower* and its progeny] was the sufficiency of the evidence of causation, not recognition of a different type of harm."). In *Gower*, the only evidence the plaintiff presented which supported his argument that the defendant's negligence caused his injury was speculative testimony that "had this case received immediate attention and had that fracture and dislocation reduced, [the plaintiff's] chances for further recovery, or for perfect recovery, would have been much greater." *Gower*, 212 N.C. at 175, 193 S.E. at 30. Yet, the plaintiff's evidence also established that even if he had received "immediate attention," there was no chance that his "fracture and dislocation" could have been "reduced." *Id.* at 176, 193 S.E. at 30. The expert witness "testified that an effort to reset [a fracture] should be made within two weeks," and other testimony established that "an effort was actually made by [a] competent physician[ ] to reset the fracture within the two weeks." *Id.* The expert witness's testimony that "the chances for further recovery would have been much greater [if the plaintiff received immediate treatment]" was both unsupported by medical evidence and affirmatively repudiated by events as they unfolded. *Id.* A naked assertion that there is a "chance" the plaintiff might have recovered if the defendant had not acted negligently is, without supporting evidence, insufficient to meet the plaintiff's burden of proof. That is no less true in the context of loss of chance claims. If the only evidence Ms. Parkes presented was an expert witness's bare

testimony that there was a "chance" tPA would have improved her odds of recovery, the trial court certainly would not have erred in denying her claim.

The majority's reliance on *Buckner v. Wheeldon*, 225 N.C. 62, 33 S.E.2d 480 (1945), is similarly misplaced. In *Buckner*, this Court did not pass up on an "opportunity" to "relax the proximate cause requirement for a medical malpractice claim" as the majority asserts. Instead, the Court in *Buckner* merely reaffirmed that a qualified physician who treats a patient in accordance with the applicable standard of care cannot be held liable for the patient's subsequent failure to fully recover.

> [I]t has been repeatedly held here that the physician or surgeon who undertakes to treat a patient implies that he possesses the degree of professional learning, skill and ability which others similarly situated ordinarily possess; that he will exercise reasonable care and diligence in the application of his knowledge and skill to the patient's care; and exert his best judgment in the treatment and care of the case entrusted to him.
>
> And in accordance with rules of general application *the liability of a surgeon cannot be predicated alone upon unfavorable results of his treatment*, and he may be held liable for an injury to his patient only when the injurious result flows proximately from want of that degree of knowledge and skill ordinarily possessed by others of his profession, or from the omission to exercise reasonable care and diligence in the application of his knowledge and skill to the treatment of his patient.

*Id.* at 65, 33 S.E.2d at 483 (cleaned up) (emphasis added). It is incorrect to construe *Buckner* to stand for anything beyond the uncontroversial proposition that a qualified physician who provides appropriate medical care to a patient will not be held liable because he or she has not acted negligently, even if the patient does not fully recover.

Regardless, the disposition in *Buckner* was reversal of the trial court's grant of defendant's motion for summary judgment, which allowed the plaintiff to bring his case to trial. *Id.* at 66, 33 S.E.2d at 483 ("While all the injurious results complained of may not be attributed to the negligence of the attending physician . . . we think there was sufficient evidence to warrant submission of the case to the jury . . . ."). Thus, even if there were some indication that the *Buckner* plaintiff had invited this Court to recognize the loss of chance doctrine and even if there were some language in the opinion that could be fairly construed as expressing skepticism about the doctrine—and there is neither—the statement the majority relies upon would be dicta, at most. *See Moose v. Bd. of Comm'rs of Alexander Cnty.*, 172 N.C. 419, 433, 90 S.E. 441, 448 (1916) ("The doctrine of stare decisis contemplates only such points as are actually involved and determined in a case, and not what is said by the court or judge outside of the record or on points not necessarily involved therein. Such expressions, being obiter dicta, do not become precedents."). The view of a federal district court called upon to apply North Carolina negligence law further confirms that *Gower*, *Buckner*, and more recent Court of Appeals' decisions have not expressed a clear opinion one way or the other on loss of chance claims. *Shumaker*, 714 F. Supp. at 163–64 (previous decisions by North Carolina courts "can, but need not, be construed as inconsistent with recognizing lost possibility as a compensable loss.").

In straining to apply extraneous precedents to the novel legal question presented to us today, the majority overlooks numerous more relevant precedents

which indicate that recognizing the loss of chance doctrine is not inconsistent with our common law tort jurisprudence. For example, when this Court has previously confronted an issue "of first impression" under North Carolina's common law, "[w]e have accordingly investigated the law in other jurisdictions to see how these jurisdictions have ruled on cases similar to the one at bar." *Jackson*, 318 N.C. at 178, 347 S.E.2d at 747; *see also Gillikin v. Bell*, 254 N.C. 244, 246–47, 118 S.E.2d 609, 611 (1961) (citing numerous cases from sister jurisdictions in "ascertain[ing] if [the common law] afforded such a right of action"); *Rabon*, 269 N.C. at 12, 152 S.E.2d at 493 (examining the "view[s] expressed in the recent decisions of our sister States" before overturning North Carolina precedent and abolishing the charitable immunity doctrine). Of course, decisions from sister jurisdictions are only instructive in this Court to the extent that we find their "reasoning and the results . . . persuasive." *Jackson*, 318 N.C. at 179, 347 S.E.2d at 748. Nonetheless, it is notable that the majority omits any reference to the numerous well-reasoned decisions from our sister jurisdictions recognizing the loss of chance doctrine as consonant with common law tort principles. *See, e.g., Matsuyama v. Birnbaum*, 452 Mass. 1, 4, 890 N.E.2d 819, 823 (2008) ("We conclude that recognizing loss of chance in the limited domain of medical negligence advances the fundamental goals and principles of our tort law."); *Smith v. Providence Health & Servs.-Oregon*, 361 Or. 456, 479, 393 P.3d 1106, 1118 (2017) ("We agree with plaintiff that . . . the causation element of a medical negligence cause of action in Oregon . . . can apply to the loss of chance when it is understood as

an injury." (cleaned up)).

A fair reading of our precedents confirms that recognizing the loss of chance doctrine serves the animating purposes and principles of North Carolina's common law of torts. This Court has endorsed the idea that, under the common law, "liability for tortious conduct is the general rule; immunity is the exception." *Rabon*, 269 N.C. at 4, 152 S.E.2d at 487; *see also Young*, 107 N.C. at 373, 11 S.E. at 1045 ("The principle that for the violation of every legal right, nominal damages, at least, will be allowed, applies to all actions, whether for tort or breach of contract, and whether the right is personal, or relates to property."). We have refused to permit concerns regarding how damages should be calculated to deter us from recognizing novel categories of injury. *Id.* at 385, 11 S.E. at 1049 ("The difficulty of measuring damages to the feelings is very great, but it is submitted to the jury in many other instances, as above stated, and it is better it should be left to them under the wise supervision of the presiding judge, with his power to set aside excessive verdicts, than, on account of such difficulty, to require parties injured in their feelings by the negligence, the malice, or wantonness of others, to go without remedy."). We have held that recognizing that a plaintiff has "stated a cognizable claim" arising from a novel factual context "for liability under common law principles of negligence" is not in tension with our judicial role, nor should recognition of the claim be avoided for prudential reasons, even when the result of our decision creates liability in a circumstance where none existed previously. *Hart*, 332 N.C. at 304, 420 S.E.2d at 177.

In departing from our historic approach to novel tort claims, the majority establishes a rule that immunizes physicians from liability for their negligent conduct any time they fail to administer a treatment that cannot be proven to be effective 50% of the time or more. *See Smith*, 361 Or. at 480, 393 P.3d at 1119 ("[A] negligent medical provider who prevents a patient from having a shot at a 45 percent chance of a favorable medical outcome need not compensate that patient at all. That patient bears the entire cost of the negligent conduct, a result that does not spread the risk of the negligent conduct to the negligent party, although a function of the tort system is to distribute the risk of injury to or among responsible parties." (cleaned up)). This "all or nothing rule is inadequate to advance the fundamental aims of tort law" because it "does not serve the basic aim of 'fairly allocating the costs and risks of human injuries' " and also " 'fails to deter' medical negligence because it immunizes 'whole areas of medical practice from liability.' " *Matsuyama*, 452 Mass. at 13, 890 N.E.2d at 830. This approach is likely to have harmful consequences given that "[m]uch treatment of diseases is aimed at extending life for brief periods and improving its quality rather than curing the underlying disease. Much of the American health care dollar is spent on such treatments, aimed at improving the odds." *McMackin v. Johnson Cnty. Healthcare Ctr.*, 73 P.3d 1094, 1099 (Wyo. 2003), *on reh'g*, 2004 WY 44, 88 P.3d 491 (Wyo. 2004).

Further, I firmly disagree with the majority's conclusion that it would be improper for this Court to recognize the loss of chance doctrine because doing so

"would require a departure from our traditional common law on proximate causation and damages . . . [because s]uch a policy judgment is better suited for the legislative branch of government." Recognizing loss of chance as a cognizable injury does not require us to create a new cause of action—the cause of action is the common law cause of action of negligence. *Cf. Hart*, 332 N.C. at 305–06, 420 S.E.2d at 178 ("The defendants, relying on cases from other jurisdictions, say that there is not a common law negligence claim against a social host for serving alcoholic beverages. . . . Our answer to this is that we are not recognizing a new claim. We are applying established negligence principles and under those principles the plaintiffs have stated claims."). As we have long held, it is entirely appropriate for this Court to "re-examine our rule[s] in the light of current conditions [and] the tide of judicial decision elsewhere." *Rabon*, 269 N.C. at 4, 152 S.E.2d at 487.

The majority approvingly quotes the Court of Appeals opinion for the proposition that "any change in our negligence law lies 'within the purview of the legislature and not the courts.' " *Parkes v. Hermann*, 265 N.C. App. 475, 478, 828 S.E.2d 575, 578 (2019) (quoting *Curl v. Am. Multimedia, Inc.*, 187 N.C. App. 649, 656–57, 654 S.E.2d 76, 81 (2007)). However, "[a]bsent a legislative declaration, this Court possesses the authority to alter judicially created common law when it deems it necessary in light of experience and reason." *State v. Freeman*, 302 N.C. 591, 594, 276 S.E.2d 450, 452 (1981). Interpreting and applying the common law in no way arrogates for this Court a function "better suited for the legislative branch of

government." *See Funk v. United States*, 290 U.S. 371, 383 (1933) ("It has been said so often as to have become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions."). Common law adjudication is not transformed into impermissible policymaking every time we "adapt[ ] [the common law] to changing scientific and factual circumstances." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 423 (2011). Rather, it is how this Court discharges one of its core judicial functions. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 784 (2002) ("[S]tate-court judges possess the power to 'make' common law . . . ."). Evolution of the common law through the application of existing principles in novel circumstances is both appropriate and obligatory because

> [o]ne of the great virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court. There is not a rule of the common law in force today that has not evolved from some earlier rule of common law, gradually in some instances, more suddenly in others, leaving the common law of today when compared with the common law of centuries ago as different as day is from night. The nature of the common law requires that each time a rule of law is applied it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice.

*Gastonia Pers. Corp. v. Rogers*, 276 N.C. 279, 287, 172 S.E.2d 19, 24 (1970) (quoting *State v. Culver*, 23 N.J. 495, 129 A.2d 715 (1957)). Thus, it in no way threatens the separation of powers that "from time to time when this Court has been convinced that changes in the way society or some of its institutions functioned demanded a change

in the law, it rejected older rules which the Court itself developed in order that justice under the law might be better achieved," even if "[t]hese decisions were sometimes made in the face of arguments that such changes ought to be made, if at all, by the legislature." *Mims v. Mims*, 305 N.C. 41, 55, 286 S.E.2d 779, 788 (1982).

It is certainly possible that recognizing the loss of chance doctrine would have consequences for the practice of medicine and the market for health insurance in North Carolina, both of which are subjects fit for regulation by the legislature. But the majority's decision to deny Ms. Parkes the opportunity to recover for her lost chance of recovery will have policy consequences all the same. *Cf.* Hans A. Linde, *Courts and Torts: "Public Policy" Without Public Politics?*, 28 VAL. U. L. REV. 821, 852 (1994) ("A rule of law is a policy, however it is explained."). What distinguishes a permissible judicial adjudication from an impermissible policymaking exercise is not the existence or nonexistence of attendant policy effects: it is whether or not the decision is justified by precedent and the reasonable application of legal principles and methods. While this Court must remain attuned to the real-world consequences of our decisions, we intrude upon an authority exclusively reserved to the legislature when we base our decisions on extrinsic policy considerations. *Id.* at 855 ("[Courts] must resolve novel issues of liability within a matrix of statutes and tort principles without claiming public policy for its own decision. Only this preserves the distinction between the adjudicative and the legislative function."). For example, I have no doubt that it would be improper for this Court to resolve Ms. Parkes' claim based upon our

own determination that "the benefits of allowing loss of chance damages . . . offset the detriments of a probable increase in medical malpractice litigation and malpractice insurance costs." *Fennell v. S. Maryland Hosp. Ctr., Inc.*, 320 Md. 776, 794, 580 A.2d 206, 215 (1990). But it does not follow that a decision arrived at through the application of sound legal principles is a "policy judgment" merely because it allows (or disallows) a claim that, inevitably, will have benefits and detriments when judged as a matter of policy. Indeed, because our resolution of this case solely involves our interpretation of the common law, the legislature may choose to override our judgment by statutory enactment, just as it would have been able to if we had instead decided to adopt the loss of chance doctrine. *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 356, 416 S.E.2d 166, 171 (1992) ("[I]f our state legislature has expressed its intent to supplant the common law with exclusive statutory remedies, then common law actions . . . will be precluded.").

Our decision today unnecessarily creates an unjust rule. Because of our decision, Ms. Parkes and patients like her are denied any opportunity to seek recompense for the harms caused by the negligent conduct of the medical professionals to whom they have entrusted their care. It accords with our precedents and principles to recognize Ms. Parkes' lost chance of recovery for what it truly was: a tangible injury caused by defendant's negligent conduct which is susceptible to valuation and is redressable in tort law. The fact that advances in medical science allow researchers to demonstrate that a treatment is 35% (or 49.9%) effective, rather

than 50.01% effective, is not a reason for denying the sole remedy available to patients wronged by medical malpractice. In contrast to the majority, I would recognize that when a physician's negligent conduct "reduces or eliminates the patient's prospects for achieving a more favorable medical outcome, the physician has harmed the patient" by destroying "something of value, even if the possibility of recovery was less than even prior to the physician's tortious conduct." *Matsuyama*, 452 Mass. at 3, 890 N.E.2d at 823. I agree with Professor Joseph King, who wrote in an influential article that

> [o]n a more visceral level [ ] the question [is] whether one who loses a not-better-than-even chance of achieving some favorable result, perhaps life, really loses nothing worthy of redress. The loss includes not only the then-existing chance, but also the loss of the opportunity to benefit from potential scientific breakthroughs that could transform the chance into reality. From a psychological standpoint, there is a qualitative difference between a condition that affords a chance of recovery and one that offers no chance at all, as any patient with terminal cancer will confirm. This inherent worth of a chance is added reason for recognizing its loss as a compensable interest.

Joseph H. King Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L. J. 1353, 1378 (1981). Extending existing common law principles to allow Ms. Parkes' claim would serve the predominant goal of tort law by providing a remedy to a "victim of medical malpractice" who otherwise lacks "any remedy at all if the common law does not provide one." *Smith*, 361 Or. at 478, 393 P.3d at 1118. The Court of Appeals decision

should be reversed, and Ms. Parkes should be allowed to present her case to a jury.

Therefore, I respectfully dissent.